# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Zafer Construction Company | ) ASBCA No. 56769 |
| | ) |
| Under Contract No. W917PM-05-C-0005 | ) |

APPEARANCES FOR THE APPELLANT:    Sam Zalman Gdanski, Esq.
    Gdanski & Gdanski, LLP
    Teaneck, NJ

    Rebia Unal, Esq.
    General Counsel

APPEARANCES FOR THE GOVERNMENT:    Thomas H. Gourlay, Jr., Esq.
    Engineer Chief Trial Attorney
    James D. Stephens, Esq.
    Michael A. Rea, Esq.
    James A. Wallace, Esq.
    Engineer Trial Attorneys
    U.S. Army Engineer District, Middle East
    Winchester, VA

## OPINION BY ADMINISTRATIVE JUDGE PAGE

This appeal arises from Contract No. W917PM-05-C-0005 (the contract) between appellant, Construction Company[1] (Zafer or appellant), and the Afghanistan Engineering District (AED) of the U.S. Army Corps of Engineers (Corps or government) for design, renovation, replacement, and repair work on a military hospital campus operated by the Afghanistan National Army (ANA) in Kabul, Afghanistan. After fully performing the work, Zafer now seeks an additional $4,104,891 (including claim preparation costs) for renovation work in basements, rooftop technical rooms, and other above-grade areas that it contends were not included in its original proposal. Appellant alleges that the omission of this alleged additional work from its proposal constituted a unilateral mistake in its proposal and that the government's acceptance of the proposal was unconscionable. Appellant also suggests in its trial brief that the various subgrade and above-grade areas constitute differing site conditions. The appeal is denied.

---

[1] This is the name of the contractor as used in the contract and numerous contract modifications (*see*, *e.g.*, R4, tabs 5-15). We understand that "Zafer Taahhut Insaat ve Ticaret A.S.," as used by the parties, is the Turkish version of the contractor's name.

## FINDINGS OF FACT

### A. The Afghanistan National Military Hospital in Kabul, AFG

1. The Afghanistan National Military Hospital in Kabul, Afghanistan (ANA hospital) is a campus consisting of multiple buildings designed and constructed by the Soviet Union from 1970-1973. The buildings of the ANA hospital campus include a 400-bed patient-care facility, operations and administration buildings, a rehabilitation building, an isolation ward, a polytechnic clinic, a morgue, a kitchen/dining facility, a laundry facility, a water supply facility, a sewage plant, a central heating plant, and quarters for the surgeon general. The ANA hospital has been in continuous use from the time of its construction and, over the course of the ensuing decades, its buildings succumbed to the ravages of armed conflict and the decay of neglect. By March 2004, the buildings on the ANA hospital campus had fallen into varying stages of disrepair, ranging from poor to fair. The condition of the major utilities infrastructure ranged from non-functional to fair: steam heat boilers and the central heat distribution system functioned at reduced capacity; electrical service was deficient; water and sewage services were deficient; and many of the elevators on the campus were non-functional. (Ex. A-7, 1 August 2012 Dep. of David M. Pecharka (hereinafter ex. A-7) at 91 of 131)

2. In March 2004, the government dispatched an assessment team comprised of architects, engineers, and a cost estimator, all of whom were contractors employed by Michael Baker Jr., Inc. (Baker), to the ANA hospital to survey the site and assess the condition of the buildings and infrastructure. The Baker team was to prepare a report that would allow the government to adequately budget for and define the work necessary to renovate and rehabilitate the ANA hospital. (Tr. 2/30-31, 34-35, 4/129) The scope of the team's assessment included the following areas and trades: water, sewer, electrical, heating, mechanical, and architectural (ex. A-7 at 91 of 131). According to Mr. Pecharka, an architect (tr. 2/26, 44) on the Baker team, the team also took measurements of the buildings "so that, in the absence of the original plan documents we would be able to do our estimates of how much, how large the facilities that were needed renovated" (tr. 2/33-34). Upon completing its assessment, the Baker team furnished its report (Baker report) to the government (tr. 2/30, 34).

3. The Baker report consisted of a Scope of Work (Baker SOW) (*see* findings 4-5), Technical Requirements (*see* finding 6), a Condition Assessment Report, Condition Assessment Photos, a Cost Estimate, a two-phase Design and Construction Schedule (*see* finding 4), and several site and floor plan sketches (*see* findings 7-8; ex. A-7 at 3 of 131).

4. The Baker SOW is found at section 01010 of the Baker report. The Baker SOW included the following "entire campus" of ANA hospital campus buildings:

Building No. 1  —  Hospital Patient Care Building

2

Building No. 2  –  Hospital Operations Building
Building No. 3  –  Hospital Administration Building
Building No. 4  –  Isolation Ward
Building No. 5A –  Kitchen
Building No. 5B –  Central Heating Plant and Laundry
Building No. 5C –  Maintenance Shops
Building No. 6  –  Morgue
Building No. 7  –  Heating Fuel Pump Station
Building No. 8  –  Rehabilitation Building
Building No. 9  –  Wastewater Treatment Plant
Building No. 10 –  Polytechnic Institute
Building No. 11 –  Engineering Offices
Building No. 12 –  Surgeon General Quarters
Building No. 13 –  Sewage Lift Station Building
Building No. 14 –  Command Center

(Ex. A-7 at 5 of 131)  The Baker Design and Construction Schedule contemplated two phases for the renovation work on the ANA hospital campus.  Phase 1 included work only on the central steam plant (Building No. 5B), the Hospital Patient Care Building (Building No. 1), and the Hospital Operations Building (Building No. 2).  (Ex. A-7 at 122 of 131)

5.  Subsection 1, "General," of the Baker SOW requires, as relevant:

> 1.7 ...During the demolition phase and prior to the start of new construction work within individual buildings, *survey the lowest level of each building for areas of standing water.*

> 1.[8][2] Numerous functional hospital areas, including exit stairs, lobbies, and corridors are currently occupied with storage and staff personal areas.  Additionally, many patient bedrooms are now occupied as staff offices and lounges.  *At the conclusion of dewatering and ventilation of hospital basement levels*, it is encouraged that these areas be used for these purposes, to allow patient care and clinical areas to more readily obtain original functions.

(Ex. A-7 at 6 of 131) (Emphasis added)

---

[2] This paragraph is numerated "1.9."  The succeeding paragraph is "1.8," and the one after that is also "1.9."  We find this to be a typographical error and of no significance.  The corresponding paragraph of the SOW is numbered "1.8" in both the solicitation (*see* finding 21) and the contract (*see* finding 58).

6. The Technical Requirements are found in section 01015 of the Baker report (ex. A-7 at 29 of 131). The Baker Technical Requirements provide in relevant part:

> 1.12 ORIGINAL PERFORMANCE CRITERIA
>
> Unless otherwise indicated..., the Contractor shall design and build renovations to obtain original performance criteria.... *Hospital engineering personnel shall grant access to full original drawing and specification documentation in Russian.*

(Ex. A-7 at 30 of 131) (Emphasis added)

7. The Baker sketches are eight sketches of the ANA hospital campus, consisting of a mix of utility site plans and partial floor plans for some of the buildings on the ANA hospital campus. The utility site plans showed the general location of water, sewer, steam, and electrical lines at the ANA hospital campus (ex. A-7 at 124-26 of 131; *see also* Fig. 1, below). The partial floor plans consisted of the first three "floors" of Building No. 1, Building No. 2, and Building No. 3 (ex. A-7 at 127 of 131; *see also* Fig. 2, below); a "typical *floor* plan" for the Building No. 1 showing flooring and other design features (ex. A-7 at 130 of 131) (emphasis added); and floor plans for Buildings Nos. 5A, 5B, and 5C (ex. A-7 at 131 of 131; *see also* Fig. 3, below). The term "floor" appears in several of the Baker sketches (*e.g.*, ex. A-7 at 127-29, 130, 131 of 131); the term "story" does not appear in any.

4



Figure 1 – Baker sketch, electrical site plan (ex. A-7 at 126 of 131)



Figure 2 – Baker sketch, "First Floor," Buildings 1, 2, 3 (ex. A-7 at 127 of 131)

6



Figure 3 – Baker sketch, Buildings 5A, 5B, 5C (ex. A-7 at 131 of 131)

8. No floor plan sketches were provided for any of the other buildings on the ANA hospital campus, although all of the campus buildings appear in the site plan sketches (e.g., Fig. 1). The scale of the sketches is small, printed on standard letter-sized paper, 8.5 inches by 11 inches, in which 1 inch equals 150 meters for site plans (e.g., Fig. 1) and approximately 20 meters for the floor plans for Building Nos. 1, 2, and 3 (e.g., Fig. 2). Buildings are denoted on the site plan sketches by diagonal along the perimeter of the building's sides, except for Building No. 10, the Polytechnic Clinic, which has no hatching on any of its sides. Because Building No. 10 lacks diagonal hatching on its sides, it is not clear from the site plan sketches whether the building surrounds an open courtyard or is itself surrounded by a roadway or parking lot. (Ex. A-7 at 124-26 of 131; *see also* Fig. 1) The floor plan sketches for Building Nos. 5A and 5B depict closely-formed and repeated straight lines (ex. A-7 at 131 of 131; *see also* Fig. 3). This is a technical symbol that is commonly used to denote stairwells.

9. The government relied upon the Baker report to prepare the request for proposal that led to the contract (tr. 4/129, 132-33). However, rather than use the Baker report's two-phase Design and Construction Schedule (*see* finding 4), the government

7

combined the phases, designating the phase 1 buildings as the "base bid" and the phase 2 buildings as "option bids" (tr. 4/133; *see also* finding 10).

*B. Procurement Background*

10. The ANA hospital rehabilitation project was contemplated as a design-build effort requiring the contractor to provide design, renovation, replacement, and repair work (R4, tab 5 at 1, 104-32).[3] The "base bid" of the project consisted of the following buildings:

> Building No. 1   –   Hospital Patient Care Building
> Building No. 5A –   Kitchen
> Building No. 5B –   Main Electrical Gear and Laundry
> Building No. 7   –   Heating Fuel Pump Station
> Building No. 9   –   Wastewater Treatment Plant
> Building No. 13 –   Sewage Lift Station Building

(R4, tab 4 at 3, 154) The following buildings and project were to be proposed as "options":

> Option 1 – Building No. 2 –   Hospital Operations Building
> Option 2 – Building No. 3 –   Hospital Administration Building
> Option 3 – Building No. 4 –   Isolation Ward
> Option 4 – Building No. 8 –   Rehabilitation Building
> Option 5 – Building No. 10 –  Polytechnic Institute[4]
> Option 6 – Building No. 6 –   Morgue
> Option 7 – Building No. 11 –  Engineering Offices
> Option 8 – Building No. 5C –  Maintenance Shops
> Option 9 – Building No. 12 –  Surgeon General Quarters
> Option 10 – Building No. 14 – Command Center
> Option 11 – Foundation for phone communication and computers

(R4, tab 4 at 3, 154-55)

---

[3] The Rule 4 files are consecutively numbered. At the hearing (tr. 5/34), the Board stated that it would just cite to Rule 4 and not annotate "supp. R4" or "app. supp. R4" in its citations.

[4] Building No. 10 is referred to as the "Polytechnic Institute" in the solicitation bid schedule (R4, tab 4 at 3), paragraph 1.5 of the solicitation SOW (*id.* at 154), the CLIN description for CLIN 0011 of the contract (R4, tab 5 at 6), and paragraph 1.5 of the contract SOW (*id.* at 133). However, Building No. 10 was identified throughout the rest of the solicitation and contract SOWs and in the Baker sketches as the "Polytechnic Clinic" (*see* findings 8, 22, 24; Fig. 1). We refer to Building No. 10 as the Polytechnic Clinic.

11. The government elected to conduct the source selection process as a competitive, negotiated procurement pursuant to the procedures set forth in FAR Part 15 (R4, tab 4 at 1-13, 18-21; tr. 4/133-34). The proposal-evaluation responsibilities of the Source Selection Evaluation Team (SSET) were divided between a non-pricing technical evaluation team and a price evaluation team (R4, tabs 331, 332; tr. 4/144, 149). Among the members of the non-pricing technical evaluation team was Ms. Elizabeth Carver (R4, tab 331 at 1).

12. The price evaluation team was chaired by Mr. William D. Mullery (R4, tab 332; tr. 4/140, 144). The contracting officer (CO) and Source Selection Authority was Dr. Sherry F. Gaylor[5] (R4, tabs 331, 332; tr. 3/245).

13. On 1 May 2004, the government issued a pre-solicitation notice for the project (R4, tab 56). On 6 June 2004, the government issued a revised notice with a new Request for Proposals (RFP) number which was otherwise identical to the 1 May 2004 notice (R4, tab 57).

*C. The Solicitation*

14. On 10 July 2004, the government issued RFP No. W917PM-04-R-0011 (solicitation) (R4, tab 16). Among those who received the solicitation were two of Zafer's employees (*id.*; tr. 1/108, 2/136-37).

15. The solicitation provided that award would be made on the basis of a best-value trade-off. The technical proposal would far outweigh the price: "The four non-pricing factors are of equal importance in the evaluation and selection processes. The four non-pricing factors, taken as a group, have significantly more weight than the pricing factor in the evaluation and selection process." The solicitation also informed potential offerors of the government's intent to award without discussions, although the government reserved the right to enter into discussions if deemed appropriate. (R4, tab 4 at 5)

16. The solicitation required offerors to submit an overarching bid schedule consisting of contract line item numbers (CLINs) and price amounts for each of the base and option bid buildings, as well as separate technical and price proposals (R4, tab 4 at 3-12). The technical evaluation criteria included consideration of the offeror's design capabilities (*id.* at 9). With respect to the price evaluation factors, the government cautioned potential offerors: "The Government will not be responsible for any misunderstandings concerning the basis for costs proposed by an offeror that results

---

[5] Dr. Gaylor was identified in the source selection documents as "Ms." We refer to her as CO Gaylor.

[sic] from that offeror's failure to provide written descriptions that are clear, complete, and easily understood" (*id.* at 12).

17. Among the solicitation's provisions and clauses set out in full text were FAR 52.215-1, INSTRUCTIONS TO OFFERORS—COMPETITIVE ACQUISITION (JAN 2004) (R4, tab 4 at 18); FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) (*id.* at 80-81); and FAR 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984) (*id.* at 81). Clauses FAR 52.236-2 and 52.236-3, along with FAR 52.233-1, DISPUTES (JUL 2002), were also set forth in full text in the ultimate contract (R4, tab 5 at 57-60).

18. The Instructions to Offerors provision states in pertinent part:

(a) Definitions. As used in this provision--

"Discussions" are negotiations that occur after establishment of the competitive range that may, at the Contracting Officer's discretion, result in the offeror being allowed to revise its proposal.

....

"Proposal modification" is a change made to a proposal before the solicitation's closing date and time, or made in response to an amendment, or made to correct a mistake at any time before award.

"Proposal revision" is a change to a proposal made after the solicitation closing date, at the request of or as allowed by a Contracting Officer as the result of negotiations.

"Time", if stated as a number of days, is calculated using calendar days, unless otherwise specified, and will include Saturdays, Sundays, and legal holidays. However, if the last day falls on a Saturday, Sunday, or legal holiday, then the period shall include the next working day.

....

[(c)](3) Submission, modification, or revision, of proposals.

(i) Offerors are responsible for submitting proposals, and any modifications, or revisions, so as to reach the

10

Government office designated in the solicitation by the time specified in the solicitation....

(ii)(A) Any proposal, modification, or revision received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and--

(1) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or

(2) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or

(3) It is the only proposal received.

(B) However, a late modification of an otherwise successful proposal that makes its terms more favorable to the Government, will be considered at any time it is received and may be accepted.

....

(f) Contract award. (1) The Government intends to award a contract or contracts resulting from this solicitation to the responsible offeror(s) whose proposal(s) represents the best value after evaluation in accordance with the factors and subfactors in the solicitation.

....

(4) The Government intends to evaluate proposals and award a contract without discussions with offerors (except clarifications as described in FAR 15.306(a)). *Therefore, the*

11

*offeror's initial proposal should contain the offeror's best
terms from a cost or price and technical standpoint.*

(R4, tab 4 at 18-20) (Emphasis added)

19. The Differing Site Conditions clause provides as relevant:

> (a) The Contractor shall promptly, and before the conditions
> are disturbed, give a written notice to the Contracting
> Officer of
>
> (1) *subsurface or latent* physical conditions at the site which
> differ materially from those indicated in this contract, or
>
> (2) *unknown* physical conditions at the site of an *unusual
> nature*, which differ materially from those ordinarily
> encountered and generally recognized as inhering in work of
> the character provided for in the contract.
>
> ....
>
> (c) No request by the Contractor for an equitable adjustment
> to the contract under this clause shall be allowed, unless the
> Contractor has given the written notice required; provided,
> that at the time prescribed in (a) above for giving written
> notice may be extended by the Contracting Officer.

(R4, tab 4 at 80-81, tab 5 at 59) (Emphasis added)

20. The Site Investigations clause imposes on the contractor an affirmative duty
to perform the following before contract award: take steps reasonably necessary to
ascertain the nature and location of the work; investigate conditions, both general and
local, which could affect the work or its cost; and inspect the site so as to ascertain, to
the extent reasonably practicable, the character, quality, and quantity of surface and
subsurface materials or obstacles to be encountered. The Site Investigations clause
states in relevant part:

> (a) *The Contractor acknowledges that it has taken steps
> reasonably necessary to ascertain the nature and location of
> the work, and that it has investigated and satisfied itself as
> to the general and local conditions which can affect the
> work or its cost,* including but not limited to...
>
> ....

12

(4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance. *The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site...as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work,* or for proceeding to successfully perform the work *without additional expense* to the Government.

(b) *The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government.*

(R4, tab 4 at 81, tab 5 at 59-60) (Emphasis added)

21. Section 01010 of the solicitation is the scope of work (SOW).[6] Subsection 1, "General," states in relevant part:

> 1.7  Provide one self-contained, portable sump pump capable of handling liquids and semi-solids, with minimum 1000W (1.34 HP) motor.  Provide four (4) watertight, wheeled containers of minimum 0.159 m3 (42 gallon) capacity with sealable lids.  During the demolition phase and prior to the start of new construction work within individual buildings, *survey the lowest level of each building for areas of standing water.*  Dewater any such areas found and transport materials removed to Wastewater Treatment Plant for disposal.  Upon completion of dewatering activity, clean affected floor and wall areas with detergent-based solution, followed by cleaning with a disinfectant approved by the Contracting Officer.  Provide portable fans to aid in drying affected areas.  Upon completion of dewatering activities, clean and disinfect the sump pump and containers, then turn over to Contracting Officer.

---

[6] In preparing the SOW, the government relied upon the Baker SOW (*see* finding 9).

13

1.8 Numerous functional hospital areas, including exit stairs, lobbies, and corridors are currently occupied with storage and staff personal areas. Additionally, many patient bedrooms are now occupied as staff offices and lounges. *At the conclusion of dewatering and ventilation of hospital basement levels*, it is encouraged that these areas be used for these purposes, to allow patient care and clinical areas to more readily obtain original functions. *The basement area may also be needed for running the new utilities* (heating hot water, domestic hot water, power, etc).

(R4, tab 4 at 18, 81, 155, 183) (Italics added)

22. Subsection 2 of the solicitation SOW, "Items of Work," generally describes the scope of the work to be performed for each of the buildings on the ANA hospital campus, both "base bid" and "option bid" buildings (*see* finding 10).[7] Subsection 2 provides, as relevant:

**2. Items of Work**

....

2.7 Patient Care Building (Building No. 1): Renovate the *eight-story* Hospital Patient Care Building.

2.8 (Option 1) Hospital Operations Building (Building No. 2): Renovate the *three-story* Hospital Operations Building.

2.9 Kitchen (Building No. 5A): Renovate exterior and interior walls, ceilings, floors, windows, doors, etc. Replace walk-in food refrigeration units, stand-alone meat freezer, plumbing systems and fixtures, heating system, ventilation and exhaust fans, and electrical systems as required at Kitchen....

2.10 Laundry (Building No. 5B): Renovate exterior and interior walls, ceilings, floors, windows, doors, etc. Replace

---

[7] The term "story," as used in paragraphs 2.7 and 2.8 of the solicitation SOW, does not appear in subsection 4 of the SOW, "Design Notes – Architectural" (*see* finding 23; R4, tab 4 at 158-61), nor in subsection 5, "Design Notes – Mechanical" (*see* finding 24; R4, tab 4 at 162-63).

14

plumbing systems and fixtures, heating system, ventilation and exhaust fans, and electrical systems as required at Laundry.

2.11  (Option 6) Morgue (Building No. 6):  Renovate exterior and interior walls, ceilings, floors, windows, doors, etc. Replace air-conditioning and ventilation system, and required electrical service, for the cadaver storage areas at Morgue. Replace plumbing system and fixtures, heating system, ventilation and exhaust fans, and electrical systems.

2.12  (Option 3) Isolation Ward (Building No. 4):  Renovate exterior and interior walls, ceilings, floors, windows, doors, etc.  Replace plumbing systems and fixtures, heating system, ventilation and exhaust fans, and electrical systems as required at Isolation Ward.

2.13  (Option 5) Polytechnic Clinic (Building No. 10): Renovate exterior and interior walls, ceilings, floors, windows, doors, etc.  Replace plumbing systems and fixtures, heating system, ventilation and exhaust fans, fire hoses/valves in existing fire hose cabinets, and electrical systems as required at Polytechnic Clinic.

2.14  (Option 4) Rehabilitation Building (Building No. 8): Renovate exterior and interior walls, ceilings, floors, windows, doors, etc.  Replace plumbing systems and fixtures, heating system, ventilation and exhaust fans, and electrical systems as required at Rehabilitation Building.

2.15  (Option 2) Hospital Administration Building (Building No. 3):  Renovate exterior and interior walls, ceilings, floors, windows, doors, etc.  Replace plumbing systems and fixtures, heating system, ventilation and exhaust fans, fire hoses/valves in existing fire hose cabinets, and electrical systems as required at Hospital Administration Building.

2.16  (Option 7) Engineering Offices (Building No. 11): Renovate exterior and interior walls, ceilings, floors, windows, doors, etc.  Replace plumbing systems and fixtures, heating system, ventilation and exhaust fans, and electrical systems as required at Engineering Offices.

2.17 Heating Fuel Pump Stations (Building No. 7): Replace fuel distribution pump motors and controls as required at Heating Fuel Pump Station.

2.18 (Option 9) Surgeon General Quarters (Building No. 12): Renovate exterior and interior walls, ceilings, floors, windows, doors, etc. Replace plumbing systems and fixtures, provide new heating system and connect to steam tunnel, provide new ventilation and exhaust system, and replace electrical systems as required at Surgeon General Quarters.

2.19 (Option 8) Maintenance Shops (Building No. 5C): Renovate exterior and interior walls, ceilings, floors, windows, doors, etc. Replace plumbing systems and fixtures, heating system, ventilation and exhaust fans, and electrical systems as required at Maintenance Shops.

2.20 Sewage Lift Station Building (Building No. 13): Replace existing heating system in kind.

2.21 Wastewater Treatment Plant (Building No. 9): Provide heating and ventilation system as required by process systems.

2.22 (Option 10) Command Center (Building No. 14): Renovate exterior and interior walls, ceilings, floors, windows, doors, etc. Replace heating, ventilation, plumbing and electrical systems.

(R4, tab 4 at 156-57) (Bold in original; italics added) In subsection 2, only paragraphs 2.7 (Building No. 1) and 2.8 (Building No. 2) specify the number of stories in any of the ANA hospital campus buildings. None of the paragraphs in subsection 2 mention basements. (*Id.*)

23. Where relevant, subsection 4 of the solicitation SOW uses the term "floor," as indicated:

**4. Design Notes – Architectural**

....

**4.1 Hospital Patient Care Building:** the following design considerations shall be incorporated into the hospital patient care building design.

16

....

4.1.1.11 Repair and replace flat roof area and metal roof edge at *seventh floor* balcony roof. Repair and replace quarry tile flooring and metal edges at balcony floors.

....

4.1.5 Renovate deficient interior and exterior areas of balance of base bid buildings...in a similar manner to the patient care building areas. Renovate wet areas as occur at laundry, kitchen et al[.] in manner indicated. Omit membrane beneath tile flooring at *ground floor* wet areas.

....

**4.3 (Options 2 thru 10) Balance of hospital campus buildings:** Renovate deficient interior and exterior areas of balance of hospital campus buildings in similar manner to patient care building areas. Renovate wet areas as occur at laundry, kitchen et al[.] in manner indicated. Omit membrane beneath tile flooring at *ground floor* wet areas.

(R4, tab 4 at 158-61) (Italics added) None of the paragraphs in subsection 4 mention basements. Notably, subsection 4 refers to "ground floor" work. (*Id.*)

24. Subsection 5 of the solicitation SOW, "Design Notes – Mechanical," does not use the term "story," as used in subsection 2, or the term "ground floor" used in subsection 4. Subsection 5 instead uses the term "first floor" throughout, as shown in the following relevant excerpts:

**5. Design Notes – Mechanical**

....

**5.2.2 Hospital Patient Care Building (Building No. 1):**

5.2.2.1 [Heating, Ventilation, and Air-Conditioning (HVAC)] Systems

5.2.2.1.1 Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment....

17

....

### 5.2.3 (Option 1) Hospital Operations Building (Building No. 2):

5.2.3.1 HVAC Systems
Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment....

....

### 5.2.5 (Option 6) Morgue (Building No. 6):

5.2.5.1 HVAC Systems
Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment.

....

### 5.2.6 Kitchen (Building No. 5A):

5.2.6.1 HVAC Systems
Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment.

....

### 5.2.7 Laundry (Building No. 5B):

5.2.7.1 HVAC Systems
Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment.

....

### 5.2.8 (Option 5) Polytechnic Clinic (Building No. 10):

5.2.8.1 HVAC Systems

Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment.

....

### 5.2.9 (Option 2) Hospital Administration Building (Building No. 3):

5.2.9.1 HVAC Systems
Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment.

....

### 5.2.10 (Option 9) Surgeon General Quarters (Building No. 12):

5.2.10.1 HVAC Systems
Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment.

....

### 5.2.11 (Option 7) Engineering Offices (Building No. 11):

5.2.11.1 HVAC Systems
Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment.

....

### 5.2.12 (Option 3) Isolation Ward (Building No. 4):

5.2.12.1 HVAC Systems
Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment.

....

19

**5.2.13 (Option 8) Maintenance Shops (Building No. 5C):**

5.2.13.1 HVAC Systems
Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment.

....

**5.2.14 (Option 4) Rehabilitation Building (Building No. 8):**

5.2.14.1 HVAC Systems
Provide a new mechanical room on the *first floor* for the heating hot water and the domestic hot water system equipment.

(R4, tab 4 at 161-63, 165-73) (Italics added)

25. Basements are mentioned in two paragraphs of subsection 5, as follows:

**5.2.2 Hospital Patient Care Building (Building No. 1):**

....

5.2.2.2 Plumbing Systems

....

5.2.2.2.4 Replace all existing sanitary drains and vent piping, from the individual fixtures to the existing vertical risers; replace all sanitary waste lines *in the basement*; use materials and procedures as specified....

....

**5.2.3 (Option 1) Hospital Operations Building (Building No. 2):**

5.2.3.1 HVAC Systems
Provide a new mechanical room.... The mechanical room can also be located *in the basement* if a permanent access

20

way is provided for removal and replacement of large mechanical equipment.

(R4, tab 4 at 162-63) (Italics added)

26. Paragraph 5.1.4 of the solicitation referred potential offerors to section 169991, Mechanical Technical Requirements, for technical requirements associated with the work to be performed under the contract (R4, tab 4 at 162). The Technical Requirements state that the contractor shall obtain original performance criteria as described and, accordingly, shall have access to full original drawings and specifications, as follows:

## 1. GENERAL

....

## 1.12 ORIGINAL PERFORMANCE CRITERIA

Unless otherwise indicated (by design calculations, standard engineering practice, or specific reference), *the Contractor shall design and build renovations to obtain original performance criteria* (i.e., products and craftsmanship shall be similar in quality, durability, ease of maintenance, and physical characteristics to the existing building components and systems). Hospital engineering personnel shall grant access to *full original drawing and specification documentation in Russian*.[8]

(*Id.* at 181, 183) (Italics added) Additionally, specific requirements applied to running HVAC system pipes through "floors above grade," as follows:

## 5. MECHANICAL

....

## 5.2 HVAC SYSTEMS DESIGN REQUIREMENTS

....

---

[8] These are the "Russian drawings" (R4, tab 4 at 183; tr. 3/19-20; *see* findings 6, 29, 34, 36-41, 60).

21

## 5.9.6 HVAC PIPING TECHNIQUES:

...Provide a fire seal where pipes pass through firewall, fire
partitions, fire rated pipe chase walls, or *floors above grade*.

(*Id.* at 200, 202, 212) (Italics added)

*D. Site Visits*

27. The record does not include any contemporaneous documentation to
evidence that a site visit or visits occurred or who among the offerors attended or did not
attend. The government alleged in post-award correspondence, dated 4 November 2004,
that site visits occurred on 2 and 9 July 2004 and that appellant's employees had
attended (R4, tab 24 at 1). On 21 December 2004, several weeks after being reminded
by appellant that the solicitation was not issued until 10 July 2004 (R4, tab 25), the
government acknowledged that it had stated the dates of the site inspections incorrectly
and stated that "[t]he actual site inspections were *scheduled on* July 12, 2004 and July
19, 2004" (R4, tab 27 at 1) (emphasis added). Witnesses for the government testified
that at least one site visit occurred (tr. 4/30, 55-56, 139-40), and that it was attended by
many (12-15) employees of potential offerors (tr. 4/57-58). Mr. William Mullery, the
government's program manager for the ANA hospital rehabilitation project, testified to
meeting prospective offerors at an entry control point near the entrance to the ANA
hospital campus (tr. 4/139-140). Mr. Mullery testified that he remembered checking the
names of contractor employees against a screening list (tr. 4/138-39), but not the date
that the site visit occurred (tr. 4/138). Another of the government's witnesses,
Mr. Webster Shipley III, had no role with the ANA hospital rehabilitation project other
than to volunteer one day to accompany the group on a site visit to the ANA hospital
campus (tr. 4/29-30). He testified extensively regarding the route taken by the site visit
and was able to recount in detail what a participant in the site visit would have been able
to see and assess (tr. 4/50-59, 64-68, 76-82). According to Mr. Shipley, the site visit
must have occurred between his organization's change of command on 4 July 2004 and
two weeks prior to his departure from Afghanistan on 1 August 2004 (tr. 4/100-01). He
was unable to be more specific: "we worked every day essentially in that environment,
so I couldn't tell you what day of the week it was, either" (tr. 4/30). The CO who
conducted the site investigation, Mr. Barr, passed away prior to giving testimony
(tr. 4/82-83).

28. Despite the lack of specificity in the record as to the date the site visit or
visits occurred, we find the government's witnesses to be credible. We find that at least
one government-sponsored site visit of the ANA hospital campus occurred sometime
between when the solicitation was issued on 10 July 2004 and 18 July 2004, and that it
was attended by representatives of potential offerors.

29. According to Mr. Shipley, he and CO Barr left the government's program manager, Mr. Mullery, at the entry control point at the entrance to the ANA hospital campus. Mr. Mullery was responsible for checking in potential offerors; Mr. Shipley and CO Barr waited for the potential offerors to join them under an awning at the west end of the Hospital Patient Care Building (Building No. 1). (Tr. 4/54-56; *see also* Fig. 1, above) Once the potential offerors had assembled, the tour proceeded to go through the main entrance of Building No. 1 and into the lobby, where CO Barr gave his introduction to the site visit (tr. 4/57; *see also* Fig. 2, above). Following introductions, the tour went from floor to floor in Building No. 1, using alternatively the elevators or the stairs, and visited the basement as well (tr. 4/56-59). The tour crossed over the road between Building No. 1 and the Hospital Operations Building (Building No. 2) using the elevated walkway. The group spent approximately 20 minutes walking through Building No. 2; it is not clear from Mr. Shipley's testimony whether the tour included the basement of Building No. 2, but the tour exited Building No. 2 at the southeast corner of the building. (Tr. 4/68) They then walked to the southwest corner of the building where they could view the Rehabilitation Building (Building No. 8) (tr. 4/77). The tour then turned completely about and proceeded eastwards past Building Nos. 5A, 5C, and 5B (tr. 4/77) to the Engineering Offices (Building No. 11). There, "we actually got to view into several of the buildings, and we saw that the engineers...actually had the old Russian drawings[9] on the walls." (Tr. 4/78) From Building No. 11, the tour walked east a little farther towards the Wastewater Treatment Plant (Building No. 9). They turned around after about a hundred meters and walked back past the north side of Building No. 11 and then past the south side of the Morgue (Building No. 6). (Tr. 4/79) Proceeding past the south side of the Central Heating Plant and Laundry (Building No. 5B), the Maintenance Shops (Building No. 5C), and the Kitchen/Dining Facility (Building No. 5A) (tr. 4/79-80), the tour continued to walk toward the Hospital Administration Building (Building No. 3) (tr. 4/80). The testimony is not clear as to whether the tour actually entered Building Nos. 5A, 5B, 5C, or 6. The tour did enter Building No. 3, however, and walked the first and second floors (tr. 4/81-82). After touring Building No. 3, the group returned to the awning at the west end of Building No. 1 where the CO pointed out to the Surgeon General's Quarters (Building No. 12) to the west (tr. 4/82; *see also* ex. A-7 at 124-26 of 131; Fig. 1, above). The tour ended there, approximately three hours after it began (tr. 4/82, 140).

30. We find that a site-visit participant would have had occasion to visually assess most of the accessible ANA hospital campus grounds (tr. 4/67), including the project buildings (R4, tabs 39-48). Although the campus tour included the interior of at least some of the buildings, including basement areas (tr. 3/17, 4/67; R4, tab 39 at 13-14), we find that the testimony was insufficiently definite for us to find that the tour

---

[9] Mr. Shipley testified that the "old Russian drawings on the walls" of the engineering offices were drawings of "[t]he [ANA] hospital grounds of themselves in the buildings. They were the utility plans and assorted documents." (Tr. 4/78; *see also* findings 26, 36-41, the discussion of the "Russian drawings")

23

included every project building or basement. In particular, the government's witness discussed "proceeding past" Building Nos. 5A, 5B, 5C, and 6, while at the same time discussing "actually going into" Building Nos. 1, 2, 3, and 9. We find that the tour went inside the buildings specified, Building Nos. 1, 2, 3, and 9. Moreover, the government's witness does not mention the Polytechnic Clinic (Building No. 10). We are unable to conclude that potential offerors were given an interior visit of Building No. 10 or that the site visit of the other project buildings was sufficient to inform potential offerors that Building No. 10 had a basement and enclosed an open area (*see* tr. 2/244-46; *compare* findings 38-39). While there is no proof that an interior visit of Building No. 10 occurred, the purpose of the site visit was to give potential offerors the opportunity to view the buildings on the ANA hospital campus and make such inquiries as would help them prepare their proposals. We find that a potential offeror participating in the site visit could have either observed the multiple above-grade floors of Building No. 10 from various vantage points on the tour or asked CO Barr questions about it.

31. Zafer did not attend a government-sponsored site visit (tr. 2/148). Zafer's chief executive officer (CEO), Mr. Necati Yagci, testified that Zafer generally attends government-sponsored site visits when they are offered (tr. 3/199-200). Witnesses for appellant and for the government alike testified that, in their experience, when a site visit is scheduled the date and time of the visit is specified somewhere in the RFP (tr. 2/148, 3/200, 4/90-91). The instant RFP, however, contains no mention of any site visit (R4, tab 4). It appears, from the government's witness testimony, that a request for information was sent to potential offerors in order to make security arrangements for a site visit (tr. 4/138), but the record does not reflect whether appellant received an invitation.

32. Despite its affirmative obligation under the Site Investigations clause to inspect the site (finding 20), the record does not reflect that Zafer made any attempt to coordinate its own site visit with either the government or the ANA prior to submitting its proposal (tr. 3/16, 199). Throughout the source selection it had a workforce located in Kabul and the contractor was in constant contact with its personnel (tr. 1/128, 3/14); however, Zafer has presented no evidence that any of its workforce visually assessed the site. Zafer's CEO, Mr. Yagci, testified that Zafer did not conduct an independent site visit prior to award (tr. 3/127, 199, 211). He explained that, in his view, the Site Investigations clause placed no "mandatory obligation" upon Zafer to visit the site before preparing its proposal (tr. 3/211). Zafer's CEO credits himself as "one of the best in Turkey that knows about those [FAR] clauses" (tr. 3/213). He testified to his understanding that the site investigations discussed in the Site Investigations clause do not require an actual visit to the site itself (tr. 3/215). It was Mr. Yagci's opinion that site visits are more about general environmental and physical characteristics and circumstances than inquiring into specific questions about the SOW:

> [The Site Investigations clause] tells you about the
> conditions, in which circumstances you are going to work.

24

[It] doesn't tell you about the scope of the work. So, that is the difference.

So, site investigation, conditions affecting the work, you can get it even from – you get on the website and you can get it from CIA fact book, about countries, that what is the currency rate, what is the inflation in the country, what is the population, what is the energy problems? Is there sufficient water, sufficient electricity?

So, [the Site Investigations clause] tells you about general information about the country. What you are talking about the site visit, there is more related with the scope of work. So, site visit, even right now, you can just make a scope of work and you want me to price it, anywhere in the world, and I can go and price it.

We have the know-how. We know that we have the database. We know how to build prices. We know how to build the risks and everything. So, we are – we have done it many times, hundred times, maybe thousand times, we have done it, everywhere.

(Tr. 3/214-15) According to Mr. Yagci, Zafer never requested a site visit (tr. 3/199).

*E. "Russian" Drawings*

33. On 14 July 2004, the government transmitted the Baker sketches to potential offerors, including Zafer's employees (R4, tab 17; *see also* R4, tab 345, app'x B at 239-54; ex. A-7 at 124-31 of 131; findings 7-8). The government's 14 July 2004 transmission did not include the "Russian drawings" (*see* findings 6, 29, 34, 37-40, 60; R4, tab 17).

34. The "Russian drawings" are discussed in the Baker report (finding 6) and section 169991 of the solicitation. These drawings include sketches of the buildings and the surrounding campus. (Findings 26, 29) One of the government's witnesses, Mr. Shipley, testified to seeing the Russian drawings mounted on the walls of the engineering offices during a site visit of the ANA hospital campus (finding 29). The Russian drawings were provided to the Board as part of appellant's supplement to the Rule 4 file (tr. 5/27-31). These consist of the original, Soviet as-built drawings and specification documentation in Russian (findings 26, 29, 37; tr. 2/187-88, 5/30). The Russian drawings appear to be voluminous, highly-detailed, and specific. Appellant had, at some point, translated portions of the drawings into English; these translations

25

are handwritten directly onto the drawings. However, the drawings are not accompanied by a certified English translation.[10] (R4, tabs 341-C, 341-D)

35. There is no evidence that Zafer made any attempt to obtain the Russian drawings from either the government or the ANA prior to submitting its proposal. Although Mr. Onder Tumer, Zafer's government-project coordinator, testified that he was not involved in preparing the proposal (tr. 3/7), he also testified that, to the best of his knowledge, Zafer did not ask the government for the Russian drawings prior to submitting its proposal; that the government did not provide the Russian drawings with the solicitation materials; and that he was "pretty sure" that Zafer did not attempt to contact the ANA to obtain the drawings before submitting its proposal because Zafer "never got into contact with the users, engineers or users, administration" (tr. 3/19-20). Zafer's CEO, Mr. Yagci, whose pre-award involvement with the proposal was limited to reviewing it "in general" and approving it for submission to the government (tr. 3/163-64, 208; *see also* findings 47-48), testified that the proposal preparation team relied only on the Baker sketches and the "specifications" (tr. 3/176).

36. According to Mr. Tumer, appellant obtained the Russian drawings from the government during appellant's post-award site assessment (tr. 2/187-88). Mr. Tumer testified that there are "Russian drawings of each and every building in the scope of work" (tr. 2/198). Upon receiving the Russian drawings, appellant's site assessment team took some notes, conducted its own site survey, took measurements of the buildings, and prepared its own drawings (tr. 2/194, 198-99).

37. Without a certified English translation of the Russian drawings, the Board is unable to understand the writing and descriptions thereon. Many of the drawings are virtually indistinguishable, and although the buildings in the drawings appear to have numbers along some of their sides that could denote measurements, they are unfortunately lacking any unit of measure that we can discern. For instance, one small portion of the bottom right-hand corner of the building in a Russian drawing labeled "7-0B-6" is marked "6000" (R4, tab 341-D, subtab 8), and we are unable to ascertain what this denotes. Neither can we reliably determine the measurements of any of the buildings from the Russian drawings. Nonetheless, we find that a potential offeror possessing the Russian drawings could discern enough information to gain a reasonably accurate understanding of the structural features of the pertinent buildings (e.g., whether a particular building has multiple floors). This is because, while the writing on the drawings is in Russian, the Russian drawings feature a number of commonly-used

---

[10] Accordingly, the government objected to their admission (tr. 2/192; 5/28). The Board admitted the Russian drawings with the understanding that it would not unilaterally attempt to interpret the Russian in the drawings, would disregard the handwritten translations, and would consider only the drawings themselves, particularly the sketches of the buildings, and Mr. Tumer's testimony describing the drawings (tr. 2/192-93, 5/31).

technical symbols, such as that denoting stairwells, which convey meaning even without certified translations. The Russian drawings "7-0B-4," "7-0B-5," "7-0B-6," "7-0B-7," and "7-0B-8," discussed below (finding 38), are illustrative.

38. The building depicted in Russian drawings "7-0B-4," "7-0B-5," "7-0B-6," "7-0B-7," and "7-0B-8" possesses a unique distinguishing feature: an open area in the center (R4, tab 341-D, subtab 8). Looking more closely at Russian drawing "7-0B-6," we can make out three separate stairwells: two along the lowermost corridor, and one at the center of the uppermost corridor (R4, tab 341-D). Comparing Russian drawing "7-0B-6" to "7-0B-5," we find that the open area in the center of the building appears in both drawings. We also discern the three stairwells that are common to Russian drawing "7-0B-6," as well as an additional stairwell in the center of the left-hand corridor (*id.*). We find that "7-0B-5" depicts the first (i.e., ground) floor of the building, while "7-0B-6" depicts an upper floor. Russian drawing "7-0B-7" is quite similar to Russian drawing "7-0B-6" (*id.*), and we find that the former depicts another upper floor (either the second or third floor). Russian drawing "7-0B-8" has an open area in the middle, but no stairwells (*id.*); Russian drawing "7-0B-4" has an open area in the middle and a stairwell in the left-hand corridor corresponding to the left-hand stairwell in the first-floor drawing, "7-0B-5" (*id.*). We find that Russian drawing "7-0B-4" depicts a basement and Russian drawing "7-0B-8" depicts a roof. We therefore find that Russian drawings "7-0B-4," "7-0B-5," "7-0B-6," "7-0B-7," and "7-0B-8" depict different floors of the same building and that a potential offeror in possession of these drawings could reasonably have known that the building depicted therein had a basement and multiple floors at or above grade enclosing an open area.

39. Comparing the building depictions in the Russian drawings "7-0B-4," "7-0B-5," "7-0B-6," "7-0B-7," and "7-0B-8" (*see* finding 38) to the Baker report floor plan sketches (*see* finding 7; Figs. 2-3, above), clearly reveals that the building depicted in Russian drawings "7-0B-4," "7-0B-5," "7-0B-6," "7-0B-7," and "7-0B-8" is neither Building No. 1, the Hospital Patient Care Building; Building No. 2, the Hospital Operations Building; Building No. 3, the Hospital Administration Building; nor Buildings No. 5A (Kitchen), No. 5B (Main Electrical Gear and Laundry), or No. 5C (Maintenance Shops). None of those buildings enclose an open area. Considering the Baker sketches; the testimony of appellant's witness, Mr. Tumer, who described Building No. 10 as having a basement, five above-grade floors, and "an empty hole" in its "mid-section" (tr. 2/142, 245); and several photographs, identified by the government as being of Building No. 10, which show multiple above-grade floors surrounding an open area (R4, tab 47), we find that Russian drawings "7-0B-4," "7-0B-5," "7-0B-6," "7-0B-7," and "7-0B-8" depict Building No. 10, the Polytechnic Clinic, which is the only building on the ANA hospital campus constructed around an open area.

40. The following Russian drawings, each of which depicts another different building, also clearly indicate the presence of sub-grade floors or basements by their use

of cutaway views and stairwells: "4-AC-4," "6-AC-3," "5-0B-30," and "19-AC-4" (R4, tab 341-D). Comparing these Russian drawings to the Baker report floor plan sketches (*see* finding 7; Fig. 2, above), reveals that the buildings depicted in these drawings are neither Building No. 1, the Hospital Patient Care Building, nor Building No. 3, the Hospital Administration Building. Without certified translations, we cannot specify which buildings are depicted in Russian drawings "4-AC-4," "6-AC-3," "5-0B-30," and "19-AC-4" (*see* findings 34, 37). However, a potential offeror in possession of the Russian drawings would have had notice that several of the ANA hospital campus buildings had sub-grade floors or basements.

41. As noted in the Baker report and the solicitation, and as Mr. Shipley testified, the Russian drawings were available in the facility's engineering offices for inspection by prospective offerors (findings 6, 26, 29). Appellant furnished no evidence that it inspected, or even tried to inspect, the Russian drawings at any time prior to submitting its proposal (*see* finding 35). We find that appellant did not use the Russian drawings to prepare its proposal. Indeed, taking into account the testimony of Messrs. Tumer and Yagci regarding the Russian drawings (findings 35-36), we find that appellant did not obtain the Russian drawings until after the contract was awarded.

*F. Appellant's Proposal Submission*

42. The due date for proposals was originally 10 August 2004, which was later extended by a week to 17 August 2004 at 4:30 p.m. (Kabul time) (R4, tab 19 at 3, 4). Zafer submitted its proposal shortly after the deadline for proposal submissions (R4, tabs 18, 19). Although the government did not expressly reject the proposal submission, Zafer was advised that the government would only consider the proposal if it was determined to be in the best interests of the government (R4, tabs 18, 20).

43. Throughout its proposal, Zafer stressed its ability to design a cost-effective solution to meet the government's requirements (R4, tabs 11-13).

44. Zafer's price proposal complied with the requirements of section 00100 of the solicitation, "Bidding Schedule/Instructions to Bidders." It consisted of a single-page listing, in three columns ("Item No," "Description," and "Amount"), of prices for each of the CLINs required by the solicitation. (*Compare* R4, tab 19 at 2, *with* R4, tab 4 at 3) Zafer's proposal did not provide any proposal takeoff sheets, work breakdown structure (WBS) documentation showing parameters considered, cost indices, historical pricing data, risk analysis, or other materials which might demonstrate how it determined the unit rates and area estimations that were used for its calculations concerning its anticipated costs to perform the project (R4, tab 19). To explain its price proposal assumptions and limitations to the government, Zafer's proposal provided only the following paragraph:

28

**Price Evaluation Factors:**

> Since the project is to renovate existing hospital and auxiliary buildings, it is assumed [that] no additional measure has been taken for the foundations of the buildings and that the walls and superstructure are in good condition. They will only require minor removal of covering down to the substrate works. Existing utilities will be abandoned in place or removed to allow for new works. All renovation works, electrical, mechanical[,] and site works should be done according to specifications and norms.

(*Id.* at 32)

45. Zafer alleges that the document located in tab 339, subtab 19, of appellant's Rule 4 file supplement consists of the background calculations that Zafer used to prepare its proposal (app. br. at 28; tr. 1/168-83, 3/172-74). These were not provided to the government as part of Zafer's proposal (tr. 1/164). Although it appears that unit quantities in several of the tables in subtab 19 are measured in meters or square meters (R4, tab 339, subtab 19 at 5, 18-20), appellant cites nothing in these tables that either explains how Zafer arrived at its meter/square meter measurements or indicates how many above-grade floors and/or basements Zafer assumed for each building. Nor has Zafer offered the testimony of anyone contemporaneously involved in the proposal preparation process to explain the document. Mr. Yagci testified to having seen the document before approving the proposal as part of Zafer's bid close-out session, but he also testified that the proposal preparation team did not discuss the document with him "in this detail" (tr. 3/173). He offered no explanation of the rationale and assumptions underlying the calculations (tr. 3/172-74; *see* finding 48). We find the document to lack probative value as to how Zafer determined the unit rates and area estimations that were used for its proposal price calculations.

46. Zafer failed to provide the testimony of anyone who either prepared Zafer's proposal or had contemporaneous knowledge of the proposal preparation team's underlying assumptions or the information it used to calculate the square footage of buildings on the ANA hospital campus. Appellant's witnesses testifying about its proposal consisted of Zafer's government-projects coordinator, Mr. Tumer, and its CEO, Mr. Yagci. Mr. Tumer testified that he had no role in preparing the proposal (tr. 3/6-7). Rather, Mr. Tumer's testimony regarding the proposal was retrospective, based upon his reading of the proposal during the claim preparation process (tr. 3/78-79). Nor did Mr. Tumer review the proposal prior to its filing (tr. 1/167, 3/6-7). Mr. Tumer testified that he first reviewed the entire proposal only during the course of discovery for this proceeding (tr. 1/167). Because Mr. Tumer testified that he had no role in preparing Zafer's proposal and appellant did not establish that he was knowledgeable of the calculations and assumptions underlying the proposal, we find the testimony of

29

Mr. Tumer to lack credibility with respect to the underlying bases for Zafer's square meters calculations or any other assumptions relied upon by Zafer in formulating its price proposal.

47. Nor did Mr. Yagci prepare the proposal (tr. 3/208-11). He testified instead that his role in the proposal preparation process was to inquire of the preparers the scope of work and pricing. He then analyzed Zafer's risks and gave final approval before the proposal was submitted to the government:

> Q What is [your role in Zafer's proposal preparation] process? What do you do?
>
> A What I do is, first they tell me what the project is.... [T]hey brief me about what the scope of work in general is, the square meters, the new construction...they tell me the type of the structure and the type of – they describe the scope of work.
>
> [S]econd, they tell me how did they make their calculations, whether they have made calculate—when they make the quantity, how did they make the quantity take-offs, because most of those projects, they start to be designed to build.
>
> ....
>
> [T]hen I ask how did you arrive [at] the prices? You made them. Did you count those prices are based on, did you talk with the site if you have—if there are available inter-prices, did you talk to them? Did you get them from [a] subcontractor? Did you estimate them based on previous experience? Did you base—did you get the prices from the database, because it is a combination of all these unit prices.
>
> So, they explain to me, what is the rationale, how did they arrive.
>
> What I am doing in general is a sort of a risk analysis. Actually, my main mission when we bid for the work, because every bidding in the solicitation it involves certain risks....
>
> So, there are many issues that you need to consider. What are the—the risk analysis is very important. What I

am doing is a risk analysis. I ask them questions about the
bank letter of guarantees, insurance, all these questions.

(Tr. 3/166-68)

48. Although Mr. Yagci testified about his typical routine for reviewing Zafer
proposals, his testimony offered little in the way of specific details about his review of
this particular proposal (tr. 3/160-76, 208-10). Mr. Yagci testified that he saw the
proposal preparation team's background calculations (finding 45) before approving the
proposal and stated that he was aware of the "rationale behind" the calculations
(tr. 3/173), but he never explained what that rationale was (tr. 3/172-74). Mr. Yagci's
testimony included nothing to indicate that he independently verified the square meter
calculations or assumptions made by those who prepared Zafer's price proposal
(tr. 3/166-68, 173). While Mr. Yagci testified that Zafer did not conduct a site
inspection prior to submitting its proposal (tr. 3/199, 211), his testimony gave no
indication that he was aware of the Russian drawings before the contract was awarded
(tr. 3/176-77; *see also* finding 35). Mr. Yagci testified that Zafer's proposal preparation
team used the Baker sketches provided by the government to prepare its proposal
(tr. 3/176; finding 35); however there is no contemporaneous evidence tying appellant's
price proposal to the Baker sketches. Nor is there contemporaneous evidence from
Mr. Yagci or another witness for Zafer indicating how appellant's price proposal
preparation team made the area calculations it used to price the proposal (*see* findings 8,
44-46). As with Mr. Tumer (finding 46), we do not find the testimony of Mr. Yagci to
be credible with respect to the underlying bases for Zafer's square meter calculations or
any other assumptions relied upon by Zafer in formulating its price proposal.

49. The record does not support any findings respecting the underlying
assumptions of Zafer's proposal preparation team or the information it used to calculate
square meters. The record does not reflect that Zafer asked the government any
questions about the solicitation, the Baker sketches, or the ANA hospital campus at any
point in its proposal preparation. We find that appellant failed to show that it raised any
inquiry to the government regarding the project site or the scope of work prior to
submitting its proposal.

G. *The Government's Proposal Evaluations and Contract Award*

50. The government received a total of nine proposals, including Zafer's late
submittal (R4, tab 60). The government spent several weeks evaluating the proposals
and deciding upon its negotiating position in the event it elected to engage in discussions
(R4, tabs 59-60, 333).

51. The government's price evaluation team performed a price evaluation
comparing its own independent government estimate (IGE) with all nine price proposals
submitted for the competition, including the technically unacceptable ones and Zafer's

31

late-submitted proposal. The IGE consisted of a Base Bid amount of $16,977,904 and an Options amount of $12,971,516, totaling $29,949,420. Zafer's proposed price consisted of a Base Bid amount of $10,940,557 and an Options amount of $6,009,645, resulting in a total proposed price of $16,950,202. Zafer's chief competitor for the project, Kolin Construction Company (KCC), proposed a Base Bid amount of $14,134,000 and an Options amount of $9,566,000 for a total price of $23,700,000. (R4, tab 333 at 26) Zafer's total proposed price for these was roughly 28% less than that of KCC and about 43% less than the total IGE. The total price proposed by KCC was approximately 21% less than the total IGE. The SSET, after considering the prices proposed, determined that Zafer's proposal was complete and reasonable and represented a low risk (R4, tab 332 at 2-3).

52. On 26 August 2004, CO Gaylor signed a memorandum to advance the source selection process. The memorandum, entitled "Non-pricing (Technical) Evaluation," reviewed the strengths and weaknesses of each proposal in relation to the technical evaluation criteria, as reported to the CO by the technical evaluation team. Despite its title, however, the memorandum also includes a summary of the price evaluation conducted by Mr. Mullery's price evaluation team and concludes with a best value determination. (R4, tab 60) According to this memorandum, appellant's principal competitor, KCC, was rated "excellent" and "low risk" in every technical evaluation category (*id.* at 2-4 of 19). KCC proposed to subcontract with an American company, Centrax of Louisville, Kentucky, for the design portion of the contract (*id.* at 3 of 19). Zafer's technical proposal was not rated as highly as KCC, with Zafer being rated "good" or "very good" in several categories (*id.* at 7-9 of 19). The memorandum included the following findings:

> a. [KCC's] proposal is 21 percent below the IGE including all options. The offeror is low risk in pricing evaluations. The offeror's subcontractor for the design is base[d] in the USA, *this means the overhead is higher* compare[d] to [a] local designer.
>
> ....
>
> c. ZAFER cost proposal is 43.4 percent below the IGE including all option items. The offeror is low risk of the price evaluations. The cost of the firm is lower compare[d] to [KCC] because the firm has an in-house designer. *This will cut overhead cost.*

(*Id.* at 18 of 19) (Emphasis added)

32

53. On Sunday 29 August 2004, the CO sent Zafer an email with the following:

> We are in the process of reviewing your bid proposal....
>
> We would ask at this time you review what you submitted as your proposal and verify your proposal prices as the total price of $16,950,202.00. This price included the base bid and the Options.
>
> Please respond to this email no later than 4:00PM on 30 August 2004.

(R4, tab 21) Monday, 30 August 2004 was a national holiday in Turkey (tr. 3/183).

54. By email on 31 August 2004, Zafer responded as follows:

> This email is to confirm that as Zafer Construction Co., our offer for ANA Military Hospital [RFP] is **$16,950,202.-** including base bid and optional bid items.

(R4, tab 21) Zafer did not furnish the testimony of any employee who was actually involved in verifying the proposal.

55. Despite its greater technical ratings, KCC was not awarded the contract because CO Gaylor determined that the difference in its technical rating did not warrant paying the price premium for the greater overhead of a design subcontractor based in the United States (R4, tab 333 at 11, 26-27; *see also* finding 52).

56. There is no evidence that CO Gaylor had knowledge of the mistake appellant alleges occurred in its proposal preparation that resulted in Zafer's underestimation of the work required. She testified that she intended only to award the contract to a "good contractor, that could complete [the] project in a timely manner, had good performance records, and provided the best value," and not to "set up" a contractor for failure by awarding to a contractor with an unreasonable, low offer (tr. 3/290). We find that CO Gaylor believed the difference in price between the KCC proposal and Zafer's proposal was the result of the difference in overhead (finding 55), which in turn resulted from KCC's choice to subcontract the design work to a firm based in the United States.

57. On 8 October 2004, the government awarded the contract to Zafer in the amount of $16,508,725 (R4, tab 5 at 1). The contract included firm-fixed price CLINs for the following buildings on the ANA hospital campus:

> CLIN 0001 – Building No. 1, Hospital Patient Care Building
> CLIN 0002 – Building No. 5A, Kitchen

33

CLIN 0003 – Building No. 5B, Main Electrical Gear and Laundry
CLIN 0004 – Building No. 7, Heating Fuel Pump Station
CLIN 0005 – Building No. 9, Wastewater Treatment Plant
CLIN 0006 – Building No. 13, Sewage Lift Station Building
CLIN 0007 – Building No. 2, Hospital Operations Building
CLIN 0008 – Building No. 3, Hospital Administration Building
CLIN 0009 – Building No. 4, Isolation Ward
CLIN 0010 – Building No. 8, Rehabilitation Building
CLIN 0011 – Building No. 10, Polytechnic Institute
CLIN 0012 – Building No. 6, Morgue
CLIN 0013 – Building No. 11, Engineering Offices
CLIN 0014 – Building No. 5C, Maintenance Shops
CLIN 0015 – Building No. 12, Surgeon General Quarters
CLIN 0016 – Building No. 14, Command Center

(R4, tab 5 at 3-8)

58. The contract SOW and Technical Requirements are identical to those in the solicitation (*compare* R4, tab 4 at 154-76 (Scope of Work), at 181-230 (Technical Requirements), *with* R4, tab 5 at 133-55 (Scope of Work), at 160-209 (Technical Requirements); *see also* findings 17-26).

*H. Post-Award Discussions*

59. The government gave Zafer the notice to proceed on 12 October 2004 (R4, tab 22).

60. Following receipt of the notice to proceed, appellant conducted a post-award, pre-construction site assessment visit (tr. 2/184). This pre-construction site visit included a tour of the basement levels of the project buildings,[11] during which appellant's employees measured the building area in order to prepare their own drawings (tr. 2/198-201). During its site visit, Zafer also obtained the Russian drawings (*see* finding 36) and used these to develop its own drawings (tr. 2/186-89, 193-97).

61. Appellant's witness, Mr. Tumer, testified that many of the basements in the ANA hospital campus buildings came as a surprise to appellant's site assessment team, including the basement in the eight-story Hospital Patient Care Building, Building No. 1 (tr. 2/139-42). Additionally, appellant's site assessment team discovered that the Polytechnic Clinic, Building No. 10, not only had a basement, it had multiple above-grade floors (tr. 2/142), and an enclosed, open area (tr. 2/245; *see also*

---

[11] Prospective contractors that participated in the site tour prior to submission of their proposals were afforded the opportunity to visit the ANA hospital campus and see the buildings (*see* finding 29).

findings 30, 39, which indicate relevant information the contractor would have learned from a pre-award site visit).

62. Appellant contends that, upon realizing that it had significantly miscalculated its estimated work area, and in particular had not accounted for certain basements and above-grade areas in the project buildings on the ANA hospital campus, it promptly brought the matter to the attention of the contracting officer's representative (COR), Elizabeth Carver. Appellant explained to the COR that it had calculated its estimated work area using only the Baker sketches provided by the government on 14 July 2004. In its 21 October 2004 letter, appellant stated: "Since we are in the very early stages of the contract we need to bring this issue to your attention, with the hope to eliminate future conflicts and discussions regarding this situation." Although appellant's letter indicates that CO Gaylor was to be copied on the email transmittal of the letter, her name was misspelled as "Gaylord" in the letter, suggesting that it was also misspelled on the email. (R4, tab 23; tr. 3/274) The email transmitting Zafer's 21 October 2004 correspondence is not in the record. CO Gaylor testified that she did not recall seeing Zafer's 21 October 2004 correspondence (tr. 3/275, 283).

63. By response letter dated 27 October 2004, COR Carver informed appellant that site inspections were held on 2 and 9 July 2004, and Zafer employees were in attendance. Moreover, the COR explained that no drawings had been provided to offerors, only site plans, and that the "dimensions and number of stories" of buildings were visible from a site inspection. Finally, COR Carver pointed out to appellant that paragraph 1.7 of section 01020 of the SOW required appellant to "survey the lowest level...for areas of standing water," which the COR noted "emphasized [the need] to survey the basement or the lower part of the building." (R4, tab 24) We find that COR Carver's use of "CF:" at the end of her response letter indicates that she intended it to be seen also by "CEAED (Kuligowski, Swartz, *Gaylor*, Ali, Eldr[e]d)" (*id.*) (emphasis added). Although the email transmitting COR Carver's 27 October 2004 response is not in the record, we find that a copy of COR Carver's response was provided to CO Gaylor. We find that regardless of whether CO Gaylor received the email transmitting Zafer's 21 October 2004 correspondence (finding 62), CO Gaylor was aware of its substance.

64. Appellant responded by letter dated 4 November 2004, reminding COR Carver that the solicitation had not even been issued until 10 July 2004 and reiterating its understanding that it had received drawings as part of the solicitation package. Again, the letter indicates that CO Gaylor was to be copied on the email transmission but, again, her name was misspelled. (R4, tab 25; tr. 3/284) CO Gaylor testified that she did not recall having seen Zafer's 4 November 2004 correspondence (tr. 3/285-86). There is no evidence in the record that CO Gaylor actually received it.

65. By letter dated 21 December 2004, COR Carver responded to Zafer's 4 November 2004 letter. She acknowledged her error with respect to the dates of the

site visit: "The actual site inspections were scheduled on July 12, 2004 and July 19, 2004." The COR also acknowledged the existence of the Baker sketches in the solicitation, but stated that "these drawings were insufficient to use for quantity take off." COR Carver's "CF:" at the end of the correspondence again indicates circulation of the letter, but this time only to "CEAED (Swartz, Sheridan, Eldred)." (R4, tab 27) CO Gaylor was no longer in-country by 21 December 2004 (tr. 3/286).

*I. Request for Equitable Adjustment and Modification of the Contract[12]*

66. By letter dated 11 April 2006, appellant submitted a request for equitable adjustment (REA) to account for schedule impacts allegedly resulting from various events beginning as early as the date of issuance of the notice to proceed, 12 October 2004 (*see* finding 59). The specific circumstances of those various events, set forth in paragraphs 1 and 3-7 of the REA, are not relevant to the instant dispute. The topical headings for those paragraphs are: "**1. Delayed Site Access**"; "**3. Untimely changed decisions and late delivery of some information during the design phases**"; "**4. Change Orders**"; "**5. Differing/Unforeseen Site conditions**" involving elevators, ductwork, and risers; "**6. Stoppage of the work due to potential terrorist actions, hindered site accesses and similar incidents**"; and "**7. Changes to the Phasing Plan & Delays due to late delivery of the buildings.**" (R4, tab 323) Appellant requested a time extension of 172 calendar days and an equitable adjustment of $1,542,002.48 (*id.* at 6). Appellant's REA did not include the certification required by 10 U.S.C. § 2410(a).

67. Paragraph 2 of the 11 April 2006 REA, which is relevant to the parties' dispute before us, stated the following:

## 2. <u>Differing site conditions</u>

Immediately after the first inspection of the compound, ZAFER determined that some of the buildings were significantly different than defined in the bid documents.

*There was a difference between the area calculated according to the bid drawings and the actual area.* There is approximately 13,000 sqm more area, which corresponds to a 41% increase above the calculated area. This issue was brought to COE's attention via **ZAFER serial letter No:1 dated 21.Oct.2004.**

---

[12] The facts in this section (findings 66-68) regarding Zafer's 11 April 2006 request for equitable adjustment and the subsequent bilateral contract Modification No. P00010, relate to the government's affirmative defense of accord and satisfaction.

*ZAFER is in the process of preparing a REA for the
additional work performed due to area increase and will
be submitted to COE as soon as possible.* This increase in
renovation area has had an impact on the overall project
resource planning and the related performance period.

(R4, tab 323 at 2) (Italics added) Zafer thus removed from the scope of its 11 April 2006 REA a request for compensation for "work performed due to area increase," amounting to "a 41% increase above the calculated area" in its proposal (*id.*). Zafer identified this issue as having been the subject of its 21 October 2004 correspondence (*id.*; *see also* finding 62). Zafer's assertions regarding "additional work performed" were later made part of its claim of 13 June 2008 (R4, tab 3 at 51 of 51).

68. In response to appellant's 11 April 2006 REA, the parties executed contract Modification No. P00010 with an effective date of 25 July 2006 (R4, tab 15 at 1). The bilateral modification is described as being "necessary to provide for an Equitable Adjustment to the contract[] for Time Delays during the period of October 12, 2004 to July 22, 2006, inclusive" (*id.* at 1-2). By this modification, the parties agreed to increase the contract value by $1,023,000 and extend the period of performance by 160 calendar days (*id.* at 3). Modification No. P00010 included waiver language which stated in pertinent part:

> In consideration of the modification agreed to herein as complete equitable adjustment for the *Contractor's "Proposal for Adjustment", submitted by letter dated April 11, 2006* for all changes as described in this modification, the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to *such facts or circumstances giving rise to the "proposals for adjustment"*.

(*Id.* at 3) (Emphasis added)

*J. Claim, Final Decision, and Appeal*

69. By letter dated 13 June 2008, appellant submitted a certified claim for $4,104,891 for renovation work done in basements and rooftop mechanical rooms, alleging that "the extent of the works carried out on site was far in excess of [that] described in the Solicitation documentation" (R4, tab 3 at 1 of 2, 3 of 51).

70. For example, claiming that there were floors "additional" to the eight stories specified in the solicitation, Zafer sought $269,795 for renovations to the basement and $155,652 for the rooftop "Winter Garden" of the Hospital Patient Care Building (Building No. 1) (R4, tab 3 at 16-18, 20, 34 of 51). In calculating the increased cost of

37

renovation work to these "additional" floors, appellant "recogni[z]ed that all of [the] floors are not necessarily the same" and grouped them into the following categories: "i. Work in the standard 'typical' floors; ii. Work in the basements; [and] iii. Work in the technical floors at the attic; (the scope of work carried out was different in each category)" (id. at 32 of 51). "Typical" floors were defined as being "more or less identical to the ones allowed for in the original contract. As a consequence[,] the value per m[2] is the same as that included in the original tender[,] thus removing any possibility of ambiguity." Regarding the second category of floors, "basements," Zafer alleged that the "intensity of the civil, mechanical, and electrical works performed was less than that carried out in the [typical] floor of the same building." Thus, the additional scope of work for basements was determined to be 35% of that of a typical floor for "civil"; the "electrical" was determined to be 30%; and "mechanical" was 20%. The rooftop mechanical rooms, or "attics," were also of lesser "intensity" than typical floors. For these, the additional scope of work was given as follows: civil was 40% of the value for a typical floor; electrical was 30%; and mechanical was 25%. (Id. at 32-33 of 51) Although the contractor characterized the "Winter Garden" on the top floor of Building No. 1 as being a "special area for the ANA Generals," for "reasons of simplicity, the scope of work [for the Winter Garden was] assumed to be equal to that of a typical floor" (id. at 33 of 51).

71. Zafer's claim breakdown for Building No. 1, below, is illustrative of the manner in which Zafer proposed its claim for each building in which it allegedly performed additional work:

| Contract Allowance | |
|---|---|
| Total Value included in Contract Sum | $8,095,237 |
| Value of Civils element | $3,940,078 |
| Value of Electrical element | $2,384,254 |
| Value of Mechanical element | $1,770,905 |
| Number of Stor[ies] included in the Bid Proposal | 8 |
| Total area included in Bid Proposal[13] | 18,560 m² |
| Area per floor | 2,320 m² |

---

[13] We note that the "Total area included in Bid Proposal" of 18,560 square meters, as cited in the claim, corresponds to certain Building No. 1 unit quantities in the undated document Zafer alleges to be its proposal background calculations (R4, tab 302 at 5, 18). However, the latter document is silent as to the underlying assumptions and rationale of the proposal preparers, upon which the area estimations are based (see finding 45).

| Value per m² | $436 / m² |
|---|---|
| **Actual** | |
| Actual number of Stor[ies] | 10 |
| Additional stor[ies] | 1) Basement, 2) Ninth Floor Winter Garden |
| Value of additional Basement. (2,047 m² @ $131.80 / m²)<br><br>Rate of $131.80/m² adjusted to reflect change in work element.[14] | $269,795 |
| Value of additional Ninth Floor Winter Garden. (357 m² @ $436 / m²)<br><br>Rate of $436.00/m² adjusted to reflect change in work element.[15] | $155,652 |

(R4, tab 3 at 34 of 51; *see also id.* at 35-48 of 51 for similar calculations for other buildings)

72. Zafer summarized its entire claim in the following "EVALUATION SUMMARY":

| Ref | Building Number | Basement | Second Floor | Third Floor | Fourth Floor | Ninth Floor | Total |
|---|---|---|---|---|---|---|---|
| 1 | [No. 1] | $269,795 | | | | $155,652 | $425,447 |
| 2 | [No. 5A] | $50,917 | $0.00 | | | | $50,917 |
| 3 | [No. 5B] | $16,889 | $0.00 | | | | $16,889 |
| 4 | [No. 7] | $22,651 | | | | | $22,651 |
| 5 | [No. 9] | | | | | | n/a |
| 6 | [No. 13] | | | | | | n/a |
| 7 | [No. 2] | $109,075 | | | $167,001 | | $276,076 |

[14] The adjusted rate for basements was calculated as follows:
Civils: ($3,940,078 / 2,320 m² = $212.29 / m²) * 0.35 = $74.3 / m²;
Electrical: ($2,384,245 / 2,320 m² = $128.46 / m²) * 0.3 = $38.5 / m²; and
Mechanical: ($1,770,905 / 2,320 m² = $95.42 / m²) * 0.2 = $19 / m².
Total adjusted rate: $74.3 / m² + $38.5 / m² + $19 / m² = $131.80 / m²
(*see* finding 70).
[15] The rate for the "Winter Garden" was not actually adjusted (finding 70).

39

| # | Ref | | | | | | Total |
|---|---|---|---|---|---|---|---|
| 8 | [No. 3] | $66,218 | | | $77,007 | | $143,225 |
| 9 | [No. 4] | $118,042 | $376,068 | | | | $494,110 |
| 10 | [No. 8] | $61,862 | $100,270 | $14,019 | | | $176,151 |
| 11 | [No. 10] | $262,851 | $836,290 | $839,020 | $309,624 | | $2,247,785 |
| 12 | [No. 6] | $60,846 | $68,661 | | | | $129,507 |
| 13 | [No. 11] | | | | | | n/a |
| 14 | [No. 5C] | $79,433 | $0.00 | | | | $79,433 |
| 15 | [No. 14] | | | | | | n/a |
| | | | | | | | |
| 16 | EC Harris Claim preparation costs | | | | | | $42,700 |
| | | | | | | TOTAL CLAIM VALUE | $4,104,591 |

(R4, tab 3 at 50 of 51)

73. In particular, Zafer claimed $109,075 for renovation work in the basement of the Hospital Operations Building (Building No. 2) (R4, tab 3 at 40 of 51), which it alleged was an "additional" story beyond the three specified in the solicitation (*id.* at 21 of 51). Of the total amount claimed for alleged additional work on the ANA hospital campus buildings, over half – $2,247,785 – related specifically to the multi-floor Polytechnic Clinic (Building No. 10), which Zafer allegedly assumed was a single-story building (*id.* at 19, 21, 50 of 51; tr. 2/232). Additionally, Zafer claimed $42,700 for claim preparation costs (R4, tab 3 at 49-50 of 51).

74. Zafer's claim alleged several bases of entitlement: first, that while "there are no ambiguities" in the solicitation, there was an "inconsistency between the RFP documents and [the] intended scope of work which was reali[z]ed after the site handover" (R4, tab 3 at 23 of 51). Zafer alleged that in preparing its proposal it had relied upon the Baker sketches that the government provided as part of the solicitation (*id.* at 22, 23 of 51). According to appellant, "[t]he additional work carried out by Zafer was "a direct result of the Contract documentation not being representative of the actual extent of the works that the CoE required to be carried out" (*id.* at 28 of 51). Zafer further asserted that "the Solicitation information was prepared by the [government] and accordingly any ambiguities contained therein will be governed by the legal doctrine of *contra proferentum*" (sic) (*id.* at 23 of 51). Finally, appellant alleged that its miscalculation of the area of work to be performed on the buildings on the ANA hospital campus constituted a "mistake in bid" which the government had a duty to meaningfully verify prior to awarding the contract. Citing the "significant disparity" between Zafer's proposed price and the government's independent estimate, appellant argued that this should have raised a presumption of error in the mind of the CO. (*Id.* at

40

23-27 of 51) Included in Zafer's claim were documents intended to support its reading of the solicitation and its pricing methodology. However, Zafer failed to include any supporting testimony or documentation to explain its original price proposal (e.g., proposal takeoff sheets, WBS documentation of parameters considered, cost indices, historical pricing data, risk analysis, etc.) (*see* findings 44-46). (R4, tab 345)

75. On 14 March 2009, the government denied the 13 June 2008 claim. The 14 March 2009 CO's final decision made no mention of either Zafer's 11 April 2006 REA (*see* findings 65, 67) or Modification No. P00010 (*see* finding 68). (R4, tab 2)

76. Appellant timely appealed on 17 March 2009.

## DECISION

Appellant has presented the Board with allegations of a CO overreaching by accepting a proposal that the government knew or should have known was erroneous. The solicitation and contract imposed an affirmative duty upon the contractor to inspect the site before submitting its proposal, and employees of the contractor were already positioned relatively near to the site and could have performed such an inspection, yet the contractor made no effort to inspect the site until after contract award. The solicitation, which was accompanied by sketches but not technical drawings, informed potential offerors that original, as-built technical drawings were available, but the contractor did not seek to obtain them until after contract award. The contractor asked no questions until after contract award. Without having inspected the site, reviewed the technical drawings, or asked anything during the proposal stages, the contractor submitted a multimillion dollar proposal for a complex project to rebuild and renovate a 30-year-old hospital campus consisting of 16 separate buildings, including a 400-bed patient-care facility. When the government asked the contractor to verify its proposal price prior to award, the contractor promptly confirmed it. Only after the contract was awarded and the contractor finally inspected the site and reviewed the technical drawings did Zafer realize that its proposal was in error.

Now, the contractor seeks to shift onto the government the responsibility for its failures to inspect and inquire prior to making its proposal. Zafer contends that: it is entitled to contract reformation because it made a mistake in preparing its proposal based on a misreading of the specifications; the government should have known about the mistake based on a comparison of Zafer's proposal price to the IGE, and therefore the government should have asked Zafer to verify its proposal price; the government's request for verification was insufficiently definite; and Zafer can show what its proposal would have been but for the error (app. br. at 77-103). Zafer also contends, in various places throughout its mistake argument, that the government's acceptance of the allegedly-mistaken proposal price was unconscionable (app. br. at 3, 80, 90, 103). Finally, Zafer asserts that "[i]f the Board determines in this case that this a differing site

41

condition," then Zafer is entitled to relief due to the existence of differing site[16] conditions, as well (app. br. at 103-07).

We will consider appellant's arguments in turn. We have jurisdiction to adjudicate this dispute pursuant to the Contract Disputes Act, 41 U.S.C. §§ 7101-7109.

*A. Unilateral Mistake[17]*

The parties have devoted considerable attention to whether the unilateral mistake doctrine applies equally to negotiated procurements such as the one here, which was procured under the procedures in FAR part 15, as it does to sealed-bid procurements (app. br. at 93; gov't br. at 29, 33-34; app. reply br. at 7-9; gov't reply br. at 1-2). Even assuming, *arguendo*, that the unilateral mistake doctrine applies with equal vigor to FAR Part 15 procurements, appellant has failed to show by clear and convincing evidence that it met the requirements of the doctrine.

As we understand appellant's briefs, Zafer attempts to support its claim with the legal argument that it is entitled to recover because it made a unilateral mistake in its proposal (app. br. at 77-91). However, Zafer does not articulate facts to support such a holding.

In order to recover under the doctrine of unilateral mistake, Zafer bears the burden of proving, by clear and convincing evidence, the following elements:

> (1) [A] mistake in fact occurred prior to contract award;
> (2) the mistake was a clear-cut, clerical or mathematical
> error or a misreading of the specifications and not a
> judgmental error; (3) prior to award, the Government knew,
> or should have known, that a mistake had been made and,
> therefore, should have requested bid verification; (4) the
> Government did not request bid verification or its request for

---

[16] Zafer uses the terms "differing site condition" and "change condition" interchangeably, although it seems to prefer the latter (app. br. at 103-07). In our discussion, we will use the term "differing site condition."

[17] Throughout its briefs, Zafer refers to its mistake argument as "mistake in bid" (app. br. at 3, 77-103), but also "mistaken bid" (*id.* at 2, 3, 6, 19) and "unilateral mistake" (*id.* at 90, 91, 93), and once even mentions in passing "mutual mistake" (*id.* at 90). Because the contours of appellant's mistake argument (*id.* at 77-91), and the underlying claim (*see* finding 74), conform to the elements of unilateral mistake, specifically, we consider them according to that doctrine. *Cf. River Ridge Dev. Auth.*, ASBCA No. 58981, 16-1 BCA ¶ 36,314 at 177,057 (discussing the doctrine of mutual mistake).

bid verification was inadequate; and (5) proof of the intended bid is established.

*McClure Elec. Constructors, Inc. v. Dalton*, 132 F.3d 709, 711 (Fed. Cir. 1997). "Clear and convincing evidence" is "evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is '*highly probable.*'" *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002). Rather than meet this high burden, Zafer seeks to shift the burden of responsibility for having underpriced its proposal by asserting that the government acted unconscionably by accepting its late-submitted proposal without a meaningful request for verification (app. br. at 80-103).

We note that elements 3 and 4 of the criteria set forth in *McClure* pertain to government knowledge or action; they do not focus on what Zafer must prove about its own actions as a contractor. Assuming solely for the purposes of argument (and we do not so find) that the government knew or should have known that a mistake had been made and that its request for proposal verification was inadequate (*see* elements 3 and 4), Zafer has not demonstrated entitlement to contract reformation using the appropriate yardstick and, accordingly, its arguments come up short. The five elements of unilateral mistake which the contractor must show by "clear and convincing evidence" are normally conjunctive, not disjunctive[18]: to prevail, appellant must demonstrate that each and every element is satisfied. *E.g.*, *McClure*, 132 F.3d at 711-12 (contractor's unilateral mistake claim failed where contractor was unable to show by clear and convincing one of the five enumerated elements).[19] In particular, Zafer has not proven elements 1, 2, or 5 as a threshold matter, which require production of evidence within appellant's purview.

---

[18] In extreme cases that may be factually distinguished from the instant appeal, the government's pre-award inquiry has been found so deficient that it failed in its duty to inform the prospective bidder of an error. *See, e.g., United States v. Hamilton Enters., Inc.*, 711 F.2d 1038, 1046 (Fed. Cir. 2000). However, for a contractor to recover under even those circumstances, it must also prove the proper elements for reformation. These are "that the error resulted from a 'clear cut clerical or arithmetical effort, or a misreading of the specifications.'" *Id.*, (citations omitted). Where the contractor fails to meet this burden, "it is well established that an erroneous bid based upon a mistake in judgment does not entitle the contractor to reformation of its contract." *Id.* at 1048 (citations omitted).

[19] A contractor must prove all of the elements articulated in *McClure*. Where a contractor fails to establish any of these, our decisions typically treat an examination of remaining elements as unnecessary. *See, e.g., PGDC/TENG Joint Venture*, ASBCA No. 56573, 10-1 BCA ¶ 34,423 at 169,926; *Altos Federal Group*, ASBCA No. 53523, 07-2 BCA ¶ 33,657 at 166,676; and *Ellis Environmental Group, LC*, ASBCA No. 54066, 07-1 BCA ¶ 33,551 at 166,163.

43

*1. The first element: A mistake in fact occurred prior to contract award*

Appellant has not shown by clear and convincing evidence that its proposal was based on or embodies a mistake. We have found a lack of credibility in the testimony of Messrs. Tumer and Yagci, which said that appellant's proposal was based on the Baker sketches and the SOW and did not account for multiple above-grade areas in some ANA hospital campus buildings or basements in most of the buildings (*see* findings 46, 48). Their testimony does not substantiate how appellant priced its bids. Zafer has failed to show us any credible evidence of the constitution of its price proposal other than a listing of the lump-sum prices proposed for each building (findings 44-45). In particular, Zafer has pointed us to nothing that would demonstrate that the assumptions and calculations underlying its proposal were, in fact, mistaken. *See Hamilton,* 711 F.2d at 1047 (appellant provided no evidence or testimony that a mistake was made in the preparation of the proposal). Counsel's unsupported argument is not proof. *Highland Al Hujaz Co.,* ASBCA No. 58243, 16-1 BCA ¶ 36,336 at 177,169. We therefore cannot say that appellant's proposal was based on or embodied a mistake rather than appellant's business decision to assume the risks of a lower-priced proposal. *See Atlantic Dry Dock Corp.,* ASBCA No. 54936, 13 BCA ¶ 35,344 at 173,472 (citing *Macro-Z Technology,* ASBCA No. 56711, 12-1 BCA ¶ 35,000 at 172,005-06) ("It is the nature of a fixed-price contract to place the risk on a bidder that exercises its business judgment to establish its price and during performance finds its price to be low.") By failing to provide either documentary evidence or credible testimony by someone knowledgeable of the assumptions made in preparing the proposal, appellant has failed to meet its burden of proving by clear and convincing evidence that its proposal was based on or embodies a mistake.

*2. The second element: The mistake was a clear-cut, clerical or mathematical error or a misreading of the specifications and not a judgmental error*

Even if we had found that appellant's proposal was based on or embodied a mistake, appellant has not shown by clear and convincing evidence that such a mistake was not a mistake in business judgment. A contract will not be reformed because of a unilateral mistake unless the contractor establishes that the error resulted from a "clear cut clerical or arithmetical error, or a misreading of the specifications." *Hamilton,* 711 F.2d at 1046) (quoting *Ruggiero v. United States,* 420 F.2d 709, 713 (Ct. Cl. 1970)). A "contractor need not be free from blame" to recover. However, a contractor is not entitled to reformation of its contract for a mistake in business judgment. *Ruggiero,* 420 F.2d at 713-14; *Liebherr Crane Corp. v. United States,* 810 F.2d 1153, 1158 (Fed. Cir. 1987) (mistake of business judgment where errant proposal resulted from "gross neglect and choice in failing properly to examine and follow the specification"); *see also Hamilton,* 711 F.2d at 1048.

Here, appellant does not allege that it committed a mathematical or clerical mistake, but rather that there was a "misreading of the specifications, whether by the government or Zafer, differently from each other" (app. br. at 83). A misreading of the specifications occurs when a contractor fails to correctly interpret various elements of the specifications. *Liebherr Crane*, 810 F.2d at 1157. However, Zafer fails to specify which (if any) of the specifications it allegedly misread. Zafer contends that "[*s*]*omewhere* there was a misreading of the specifications, or a mutual mistake on the specification, or a unilateral mistake or noncompatible [sic] interpretation between the parties" (app. br. at 90) (emphasis added). To the extent that it can be discerned from its unilateral mistake argument (*id.* at 77-103), appellant apparently contends that its misreading of the specifications resulted from: the government's failure to include photographs of the ANA hospital campus and to specify in the solicitation SOW which buildings had basements; appellant's assumptions based on another contract it was performing at the time[20] (*id.* at 78); and appellant's use of the site and floor plan sketches for its takeoffs (*id.* at 82). Mistakes stemming from such bases do not find a remedy in the law.

Where there are gaps, inconsistencies, or insufficient information in the solicitation documents, and the contractor's failure to inquire with the government results in an erroneous proposal, the contractor assumes the risk of its failure to inquire. *See, e.g., Giesler v. United States*, 232 F.3d 864, 870-71 (Fed. Cir. 2000) (appellant's bid without having verified the specifications cannot be construed as a "misreading"); *DynCorp*, 17-1 BCA ¶ 36,653 (appellant's decision to submit a proposal without having first inquired into "gaps" in the solicitation data was a business judgment). The Baker sketches and the solicitation SOW raise several questions that should have spurred appellant's duty to inquire (*see, e.g.,* findings 8, 21-26). For example, the Baker sketch of Building Nos. 5A and 5B depicts stairwells for each of these buildings that indicate additional floors (finding 8). Each of these buildings is included in Zafer's claim (finding 72).

However, appellant did not ask the government any questions prior to submitting its proposal (finding 49). Nor does the record reflect that Zafer made any effort to obtain the Russian drawings or inspect the site until after contract award (findings 41, 32). Where, as here, the contractor's mistake resulted from "gross negligence in failing to read and consider the specifications thoroughly," and the contractor made assumptions without any attempt of verification with the government, such a mistake has been held to have been one of business judgment, not a misreading of the specifications. *See, e.g., Giesler*, 232 F.3d at 870-71; *Liebherr Crane*, 810 F.2d at 1157.

Furthermore, "[w]here a contractor's failure to inspect the site gives rise to later fallacious estimate of the scope of work, it assumes the risk of its own omission."

---

[20] The other contract dealt with the ANA military academy, which was not shown to be relevant to the work in this contract.

*Sealtite Corp.*, ASBCA No. 26209, 83-2 BCA ¶ 16,792 at 83,479. The government conducted at least one site visit (findings 28-30), which Zafer did not attend (finding 31) and expressed no interest in attending (finding 32). Even if the government failed to provide Zafer with notice of the site visit, the Site Investigations clause placed on Zafer an affirmative obligation to inspect the site (finding 20). *See, e.g., Oman-Fischbach Int'l (JV) v. Pirie*, 276 F.3d 1380, 1384-85 (Fed. Cir. 2002) ("Paragraph (a) [of FAR 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984)] makes clear that the burden of [inspecting the site] is the responsibility of the contractor"); *Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1267-68 (Fed. Cir. 2001) (The Site Investigations clause "at least facially, place[s] on [the contractor] any risk associated with not inspecting the [work]"); *Luhr Bros., Inc.*, ASBCA No. 52887, 01-2 BCA ¶ 31,443 at 155,292. Absent notice by the government of a scheduled site visit, Zafer had a duty to inquire as to when a site visit was scheduled or make its own alternate arrangements to inspect the site. Zafer did not do so. (Finding 32) Had appellant inspected the site, it would have seen the ANA hospital campus buildings, including several basements, and would have been able either to see the buildings with multiple above-grade floors or to ask the CO about them (finding 30). Assuming, *arguendo*, that appellant's proposal was based on or embodied a mistake, that error resulted from Zafer's failure to inspect the site or review all available information rather than a misreading of the specifications.

Zafer has failed to show by clear and convincing that it actually misread any of the specifications. Zafer's decision not to request a site visit, much less participate in one, was a business judgement. Zafer's decisions not to obtain the Russian drawings or ask any questions about the Baker sketches or the solicitation prior to submitting its proposal were also business judgments. We conclude that it was these mistakes in business judgment, rather than a demonstrated misreading of the specifications, to which the alleged error in Zafer's price proposal must be attributed. Zafer is not entitled to contract reformation for such mistakes.

### 3. The fifth element: Proof of the intended bid is established

Relating to the government's response to the bid, and as we have determined that it is unnecessary that we discuss elements of proof 3 or 4, we turn to the fifth element which a contractor must prove to obtain relief for unilateral mistake. To satisfy element 5, "[t]he contractor must establish by clear and convincing evidence what [its proposal price] would have been but for the error." *Hamilton*, 711 F.2d at 1046 (citing *Bromley Contracting Co. v. United States*, 596 F.2d 448 (Ct. Cl. 1979)). As we discussed under the first element, Zafer has failed to show us any evidence of the basis of its price proposal other than a listing of the lump-sum prices proposed for each building (findings 44-45). Zafer's proposal did not provide any proposal takeoff sheets, showing parameters considered, cost indices, historical pricing data, risk analyses, or other materials which might demonstrate how it determined the unit rates and area estimations that were used for its calculations concerning its anticipated costs to perform the project

46

(finding 44). The retrospective testimony of Mr. Tumer and the routine-proposal-review testimony of Mr. Yagci, neither of whom actually prepared Zafer's proposal (findings 46-48), are insufficient to establish by clear and convincing evidence what the proposal price would have been but for the alleged mistake. Zafer, by failing to provide either documentary evidence of the composition of its proposal or testimony by someone involved in preparing the proposal, failed to prove by clear and convincing evidence what its proposal price would have been but for the alleged mistake.

Because appellant has failed to show by clear and convincing evidence that: a mistake in fact occurred prior to contract award (element 1); the mistake was a clear-cut, clerical or mathematical error or a misreading of the specifications and not a judgmental error (element 2); and proof of the intended bid is established (element 5), appellant's unilateral mistake arguments fail. As Zafer has failed to prove these three threshold elements, and it is unnecessary that we examine either elements 3 or 4, we conclude that Zafer cannot recover on the basis of an alleged unilateral mistake.

*B. Unconscionability*

Zafer repeatedly asserts that it is "unconscionable" to allow the government to overreach, and take advantage of a contractor making a unilateral mistake in its proposal that the government knew or should have known was erroneous. It contends that this appeal is "a mistake in bid / unconscionability case" (app. br. at 103). Although we agree that it is unacceptable for the government to act unconscionably, Zafer once more did not furnish evidence to support its assertion that the government acted unconscionably here. As we understand its briefs, appellant ties this argument to its assertion of a mistaken proposal in an attempt to shift the burden of proof to the government for Zafer's own failures of business judgment. But it is Zafer, not the government, that bears the burden of proving that the government acted unconscionably. As we have stated:

> We have described "'[u]nconscionability' [as] that which 'shocks the conscience' and [which] is associated with such concepts as 'overreaching,' 'taking undue advantage,' 'bad faith,' 'unfairness,' and 'unjust enrichment'" and have stated that it is "indistinguishable from the other party's knowledge or reason to know of a mistake." *Uniflite, Inc.*, ASBCA No. 27818, 85-1 BCA ¶ 17,813 at 89,036. An unconscionable contract is "one which no man in his senses, not under a delusion, would make, on the one hand, and which no fair and honest man would accept on the other." *Glopak Corp. v. United States*, 851 F.2d 334, 337 (Fed. Cir. 1988), quoting *Hume v. United States*, 21 Ct. Cl. 328, 330 (1886), *aff'd*, 132 U.S. 406 (1889); *Rockwell International Corp.*, ASBCA No. 41095, 97-1 BCA ¶ 28,726 at 143,388.

47

> A determination of unconscionability depends on the facts of each case at the time of contract award and is found "only in exceptional circumstances." *Turner-MAK (JV)*, ASBCA No. 37711, 96-1 BCA ¶ 28,208 at 140,793.

*Macro-Z Tech.*, 12-1 BCA ¶ 35,000 at 172,006.

Appellant's argument for overreaching appears to be based upon the disparity between Zafer's proposal and both the next-lowest submission and the IGE (app. br. at 80, 90). Disparity in proposal prices alone, even in connection with an IGE, is insufficient to establish a cognizable claim of unconscionability. *See, e.g.*, *Turner-MAK*, 96-1 BCA ¶ 28,208 at 140,793; *W.B.&A., Inc.*, ASBCA No. 32524, 89-2 BCA ¶ 21,736. Two circumstances, neither of which is sufficiently rebutted by appellant, militate against a finding that the government acted unconscionably. First, the government did request that Zafer confirm its proposal price (finding 53). Second, CO Gaylor gave a credible explanation for her belief that the price disparity was accounted for by the next lowest offeror's higher overhead, which was attributed to its use of a subcontractor based in the United States (*see* findings 52, 55).

As we noted in *DynCorp International LLC*, ASBCA No. 56078, "[t]he doctrine of unconscionability requires no separate analysis [from that of unilateral mistake] because unilateral mistake is a descend[a]nt from the doctrine of unconscionability." *DynCorp*, 09-2 BCA ¶ 34,290 at 169,407 n.3 (citing 7 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 28.41 at 258 (rev. ed. 2002)). The common concern at the heart of both doctrines is "the overreaching of a contractor by a contracting officer when the latter has the knowledge, actual or imputed as something [they] ought to know, *that the bid is based on or embodies a disastrous mistake* and accepts the bid in face of that knowledge." *Ruggiero*, 420 F.2d at 713-14 (emphasis added).

Just as Zafer failed to satisfy its legal burden to establish a unilateral mistake in its proposal, it has not established that the government overreached by accepting the proposal. Again assuming, *arguendo* and without so deciding, that the government was required to request Zafer to verify its proposal and the government's request for proposal verification was inadequate, appellant has still not established entitlement, as it must, by satisfying the remaining elements of proof by clear and convincing evidence. Among other things, appellant has not shown that the proposal was, in fact, based on or embodies a mistake that occurred prior to contract award, and that such a mistake was a clear-cut clerical or mathematical error or a misreading of the specifications, and not an error in business judgment. *See, e.g.*, *Ellis Envtl. Grp., LC*, ASBCA Nos. 54066, 54067, 07-1 BCA ¶ 33,551 at 166,162-63 (citing *McClure*, 132 F.3d at 711). Without such a showing as to mistake, as low as appellant's proposal price might be when compared to the IGE or that of the next-lowest offer, the risk of it remains with appellant to bear. *E.g.*, *Atlantic Dry Dock*, 13 BCA ¶ 35,344.

## C. Differing site conditions

It is not entirely clear whether Zafer intends to pursue relief under a differing site conditions theory. In fact, Zafer twice disclaims this theory, while, nevertheless, inviting us to make our own investigation in that regard: "Appellant does not believe this is a Change Conditions Type I or Type II, rather it's a mistake in bid/unconscionability case. However, if the Board determines it is[,] appellant has met the requirements" (app. br. at 103); and, "Appellant does not believe this is a case of a differing site conditions situation either Type 1 or Type 2.... However, if the Board views this as a differing site condition[,] then appellant meets the requirements of entitlement under that clause." (*Id.* at 105-06)

The contract includes the standard Differing Site Conditions clause (*see* findings 17, 19), "[t]he purpose of [which] is to allow contractors to submit more accurate bids by eliminating the need for contractors to inflate their bids to account for contingencies that may not occur." *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1343 (Fed. Cir. 1998) (citing *Foster Constr. C.A. & Williams Bros. Co. v. United States*, 435 F.2d 873, 887 (Ct. Cl. 1970)). "Differing site conditions can arise in two circumstances: (1) the conditions encountered differ from those indicated in the contract (Type I), or (2) the conditions encountered differ from those normally encountered (Type II)." *Id.* at 1343.

To the extent that Zafer's cryptic remarks require that we consider whether there were differing site conditions, we note that the elements of proof required to establish entitlement under a "Type I" legal theory are as follows:

> The elements of a Type I differing site condition, which FAR 52.236-2(a)(1) defines as "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract," are: (1) the condition indicated in the contract differs materially from those encountered during performance; (2) the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; (3) the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and (4) the contractor was damaged as a result of the material variation between expected and encountered conditions. *Optimum Services, Inc.*, ASBCA No. 58755, 15-1 BCA ¶ 35,939 at 175,653-54 (citing *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed. Cir. 1987); and *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002)). A

> contractor must prove these elements by a preponderance of the evidence. *Id.*

*Tetra Tech Facilities Constr., LLC*, ASBCA Nos. 58568, 58845, 16-1 BCA ¶ 36,562 at 178,085.

Once more, even assuming *arguendo* that Zafer had met elements 1 and 2 of a "Type I" legal theory, the contractor faces the same impediment in satisfying elements 3 and 4 as in its assertion of a unilateral mistake. The common factor for each of these is that appellant must furnish evidence of the contract-related information relied upon at the time it prepared and submitted its proposal and how its demonstrable proposal price for each item of recovery was exceeded by increased costs of performance. Other than Mr. Yagci's broad statement, without further explanation, that he was aware of the proposal preparers' rationale, Zafer failed to furnish any substantive information regarding reasonable assumptions it made that are tied to the information made available by the government to prospective offerors (findings 44-48). As appellant failed to meet its burden of proof that it relied upon allegedly erroneous or deficient government-furnished information in making its proposal, it is unnecessary that we make a detailed comparison of the solicitation and conditions actually encountered on the ground.

Having said that, however, we note that the Baker sketches clearly indicated the existence of stairwells in Building Nos. 5A and 5B (finding 8). We have also found that Zafer could have learned from the Russian drawings about the existence of basements and above-grade areas that might not otherwise be identified in the solicitation (findings 37-40), and that Zafer furnished no evidence that it even attempted to obtain them until after contract award (findings 41, 60). "[W]here a claim is made for differing site conditions, the contractor will be charged with knowledge that it could have obtained by reviewing available bid documents." *Comtrol*, 294 F.3d at 1364 (citing *Randa/Madison*, 239 F.3d at 1270-71). "[The contractor] cannot bid in ignorance and then base a claim for equitable adjustment on a document that it did not review." *Id.* at 1364. In any event, the government sufficiently demonstrated that work on particular subgrade and above-grade areas, for which Zafer seeks additional compensation because it allegedly left these out of its proposal, could readily have been determined from a site investigation and information contained on the Russian drawings (findings 30, 37-41). The Site Investigation clause places the burden on the contractor (finding 20). *See Luhr Bros.*, 01-2 BCA ¶ 31,443 at 155,292 ("[The contractor] must show that prior knowledge of the alleged [differing site condition] could not reasonably have been anticipated by its study of the contract documents [and] its inspection of the site."). Zafer admits that it did not investigate the site prior to submitting its proposal, offered no proof that it inquired of its own initiative regarding a site visit, and in fact dismissed the need for a site visit as unnecessary (finding 32). Nor did appellant analyze all information made available by the government.

The elements required to establish entitlement under a "Type II" legal theory are as follows:

> A Type II differing site condition requires the contractor to prove the recognized and usual conditions at the site, the actual physical conditions encountered and that they differed from the known and usual, and that the different conditions caused an increase in the cost of contract performance. *Charles T. Parker Constr. Co. v. United States*, 433 F.2d 771, 778 (Ct. Cl. 1970); *Costello Industries, Inc.*, ASBCA No. 49125, 00-2 BCA ¶ 31,098 at 153,585. It is a "relatively heavy burden of proof." *Parker Constr.*, 433 F.2d at 778.

*Nova Group, Inc.*, ASBCA No. 55408, 10-2 BCA ¶ 34,533 at 170,329. "Most fundamentally, establishing entitlement to recovery for a Type II differing site condition require[s] that the contractor prove, *inter alia*, that the conditions encountered were of an 'unusual' nature." *MARCON Eng'g, Inc.*, ASBCA No. 57471, 15-1 BCA ¶ 35,974 at 175,773-74 (citing *Kos Kam Inc.*, ASBCA No. 34037, 88-3 BCA ¶ 21,100 at 106,524). "An 'unusual' condition is one that might not reasonably be anticipated given the nature and location of the work." *Kilgallon Constr. Co.*, ASBCA No. 51601, 01-2 BCA ¶ 31,621 at 156,224 (citing *Kinetic Builders, Inc.*, ASBCA No. 32627, 88-2 BCA ¶ 20,657 at 104,400).

Appellant has offered no argument, much less any evidence, that subgrade and above-grade areas of buildings on the ANA hospital campus constitute "unknown conditions" of an "unusual nature" given the work required by the contract and Zafer's experience. We do not see how such an argument could feasibly be made considering the facts of this case. The Baker sketches showed only some of the above-grade floors (*see* Fig. 2 for Building Nos. 1, 2, and 3) and clearly indicated the existence of stairwells in Building Nos. 5A and 5B (*see* Fig. 3). The solicitation contained numerous, varying references to basements and above-grade areas; a site inspection would have revealed that many, if not most, of the buildings included subgrade and above-grade areas; and the Russian drawings indicated subgrade and above-grade areas in many of the buildings. (*See* findings 7-8, 21-26, 30, 37-40)

We conclude that appellant has not shown that any of the subgrade and above-grade areas of the ANA hospital campus constitute either "Type I" or "Type II" differing site conditions.

*D. Appellant's other arguments; the government's affirmative defense*

We have considered the other arguments advanced by appellant (e.g., defective specifications and "contra proferentem") and find them to be without merit. Given appellant's failure to argue its alternative theories in its post-hearing briefs, it is

51

unnecessary for us to discuss our rejection of them in detail. *See States Roofing Corp.*, ASBCA No. 54860 *et al.*, 10-1 BCA ¶ 34,356 at 169,664 (failure to address pleading contention in post-hearing briefs equated to abandonment of the issue).

The government contends in its post-hearing briefs that the affirmative defense of accord and satisfaction applies in this case, and therefore appellant is not entitled to further reformation of the contract (gov't br. at 36-37). The government argues that bilateral Modification No. P00010 (*see* findings 66-68) addressed the instant dispute, and that the government has performed its responsibilities under the modification and the defense of accord and satisfaction therefore applies (gov't br. at 36-37). Inasmuch as we have held that appellant has failed to satisfy its burden of proving entitlement under any of the theories advanced, it is unnecessary for us to address the government's accord and satisfaction affirmative defense. *E.g.*, *Rainbow Elec. Co.*, ASBCA No. 9212, 65-2 BCA ¶ 5119 at 24,103.

## CONCLUSION

For the foregoing reasons, the appeal is denied.

Dated: 2 June 2017

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

J. REID PROUTY
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 56769, Appeal of Zafer Construction Company, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals